681 So.2d 433 (1996)
Frederick RAPP, et al,
v.
CITY OF NEW ORLEANS.
No. 95-CA-1638.
Court of Appeal of Louisiana, Fourth Circuit.
September 18, 1996.
Rehearing Denied November 6, 1996.
Order Clarifying Decision on Denial of Rehearing November 12, 1996.
*436 Neil J. Kohlman, Assistant City Attorney, Milton Osborne, Jr., Deputy City Attorney, Avis Marie Russell, City Attorney, New Orleans, and Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., James A. Babst, Dona J. Dew, Scott C. Barney, New Orleans, for Defendant-Appellant.
Robein, Urann & Lurye, Magdalen Blessey Bickford, Louis L. Robein, Jr., Metairie, for Plaintiffs-Appellees.
Before BYRNES, ARMSTRONG and WALTZER, JJ.
BYRNES, Judge.
The City of New Orleans appeals an adverse ruling on motion for summary judgment involving twenty separate worker's compensation claims asserted against it by twenty retired employees of the New Orleans Fire Department. The plaintiffs answered the appeal asking for an increase in attorney's fees and penalties awarded by the hearing officer as compensation for the extra burden placed on the plaintiffs by virtue of defending this appeal, which plaintiffs contend is without merit.[1]

I. STANDARD OF REVIEW
Appellate courts review summary judgments de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94); 634 So.2d 1180; Schroeder v. Board of Sup'rs of Louisiana State University, 591 So.2d 342, 345 (La.1991). A summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B). All evidence and inferences drawn from the evidence must be construed in the light most favorable to the party opposing the motion. Carr v. City of New Orleans, 622 So.2d 819, 822 (La.App. 4 Cir.), writ denied, 629 So.2d 404 (La.1993) and Dibos v. Bill Watson Ford, Inc., 622 So.2d 677, 680 (La.App. 4 Cir.1993). To satisfy his burden, the party moving for the summary judgment must meet a strict standard by showing that it is quite clear as to what the truth is, and that it excludes any real doubt as to the existence of material fact. Vermilion Corp. v. Vaughn, 397 So.2d 490 (La.1981). The papers supporting the position for the party moving for the summary judgment are to be closely scrutinized while the opposing papers are to be indulgently treated, in determining whether mover has satisfied his burden. Vermilion, supra.
Where the trial court is presented with a choice of reasonable inferences to be drawn from subsidiary facts contained in affidavits, exhibits, and depositions, reasonable inferences must be viewed in the light most favorable to the party opposing the motion. Duvalle v. Lake Kenilworth, Inc. 396 So.2d 1268 (La.1981). No summary judgment will be granted even if the trial court has grave doubts regarding a party's ability to establish disputed facts. Aydell v. Charles Carter & Co., Inc., 388 So.2d 404 (La.App. 1 Cir.), writ denied 391 So.2d 460 (La.1980). The fact that a party is unlikely to prevail at a trial on the merits is an insufficient basis for rendering a summary judgment against that party. Chapeuis v. Cassimano, 568 So.2d 606 (La. App. 4 Cir.), writ denied 571 So.2d 629 (La.1990). This is true no matter how small the chances of the party opposing the motion to ultimately prevail appear to be. Dearie v. Ford Motor Co., 583 So.2d 28 (La.App. 5 Cir.), writ denied 588 So.2d 1117 (La.1991). *437 It is not the function of the trial court on a motion for summary judgment to determine or even inquire into the merits of the issues raised. Morris v. Louisiana Coca-Cola Bottling Co., Ltd., 354 So.2d 659 (La.App. 1 Cir.1977). The weighing of conflicting evidence on a material fact has no place in summary judgment procedure. Mecom v. Mobil Oil Corp., 299 So.2d 380 (La.App. 3 Cir.), writ denied 302 So.2d 308 (La.1974). Testimony should neither be received nor considered, even with the consent of counsel, to decide a motion for summary judgment. Urban Management Corp. v. Burns, 427 So.2d 1310 (La.App. 2 Cir.1983); Hemphill v. Strain, 341 So.2d 1186 (La.App. 1 Cir.1976), writ denied 343 So.2d 1072 (La.1977). Making evaluations of credibility has no place in determining a summary judgment. Dixie Buick, Inc. v. Lockett, 263 So.2d 56 (La.App. 4th Cir.1972). A motion for a summary judgment is not to be used as a substitute for trial on the merits. Oller v. Sharp Elec., Inc., 451 So.2d 1235, 1237 (La.App. 4th Cir.), writ denied 457 So.2d 1194, appeal after remand 514 So.2d 176, writ denied 519 So.2d 117.
Of especial significance to reviewing the summary judgment in this case is the following principal enunciated in Dearie v. Ford Motor Co., supra, 583 So.2d at 30:
The mere fact that a party has filed a motion for summary judgment along with an affidavit does not compel judgment in favor of the mover and the record as a whole must evidence that all critical elements of the opposing party's case has been set to rest, no matter how small the opposing party's chances to ultimately prevail may appear, notwithstanding that the opposing party failed to file a counteraffidavit. [Emphasis added.]
The burden does not shift to the party opposing the summary judgment until the moving party first presents a prima facie case showing that there are no genuine issues of material fact. Manders v. Singleton, 558 So.2d 772, 775 (La.App. 5 Cir.1990). Where the moving party fails to show that there are no genuine issues of material fact, the adverse party may rest on mere allegations or denials contained in his pleadings. Downtown Parking Service, Inc. v. Hyman, 93-1803, (La.App. 4 Cir. 3/15/94); 635 So.2d 282, 284, writ denied 94-1519 (La.9/23/94), 642 So.2d 1298.
Argument of counsel and briefs, no matter how artful, are not sufficient to raise a genuine issue of material fact. Despite the presence of disputed facts, summary judgment will be granted as a matter of law if the contested facts present no legal issues. Davenport v. Amax Nickel, Inc., 569 So.2d 23, 27 (La.App. 4 Cir.), writ denied 572 So.2d 68 (La.1991).

BURDEN OF PROOF
The major issue of this appeal is the award by the trial court of Supplemental Earnings Benefits based on findings that plaintiffs were disabled as a result of work related accidents, and unable to earn 90% of their pre-injury wages for that period. If the City bore the burden of rebutting the plaintiffs' claims that they were disabled from obtaining work at 90% or more of their pre-injury compensation, the City must lose because it failed to introduce any countervailing affidavits, depositions, etc. The City may only prevail if that burden was on the plaintiffs and they fail to carry it, even in the absence of a contrary showing by the City.
Our reading of the reasons for judgment of the hearing officer is that he found that once the plaintiffs established that they could not return to their firefighting jobs because of job related injuries, the burden then shifted to the City to prove that they were unable to earn 90% of their pre-injury wages for that period. In his additional reasons for judgment the hearing officer reasoned that:
In Bridges, the Fourth Circuit upheld the lower court's granting of a summary judgment dismissing the employee's case on the basis of uncontradicted doctor reports which stated that the employee has no work-related disability. Likewise, it seems reasonable that if an employee presents uncontradicted doctor reports stating that he has a work-related disability, he can also be entitled to summary judgment in his favor.
*438 This is an oversimplification. While a showing that there is no work related disability is enough to deny benefits, the converse is not true. An uncontradicted showing by a worker that he is prevented by a work-related disability from performing his previous employment without more does nothing in and of itself to prove that the worker is unable to perform other work for which his compensation could be 90% or more of what he previously earned. It is not enough just to prove the inability to continue in the pre-injury job.
The hearing officer relied on Hebert v. Grey Wolf Drilling Co., Inc., 611 So.2d 674, 677 (La.App. 3 Cir.1992). But even Hebert does not say that it is sufficient to show merely that one can no longer perform one's pre-injury employment. Hebert held that the burden shifts to the employer on a mere showing by the employee that he is not working or is earning less than he was able to earn prior to the job related injury. This, too, is insufficient to shift the burden to the employer. To the extent that Hebert and other cases like it conflict with the law of this circuit as expressed in Herty v. City of New Orleans, 94-1960, p. 5 La.App. 4 Cir. 4/13/95); 654 So.2d 785, 788 and Smith v. Hamp Enterprises, Inc., 95-2343, p. 4 (La. App. 4 Cir. 4/17/96); 673 So.2d 267; and as expressed by the Louisiana Supreme Court in Smith v. Louisiana Dept. of Corrections, 93-1305, (La.2/28/94); 633 So.2d 129, 132, we shall not follow them. To do otherwise would provide a claimant with a strong incentive to remain unnecessarily unemployed. Id.
The burden of proof in such situations was described by this Court in Herty, 654 So.2d at 788:
Keeping in mind that the worker's compensation law is to be liberally construed in favor of coverage, claimant has the initial burden of showing that the workrelated accident results in an inability to earn at least 90 percent of his former wages. [Emphasis added.] Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129. Once the employee's burden is met, the burden of proof then shifts to the employer who must show that the claimant is physically able to perform a certain job and that job was offered to the employee or that job was available to the employee in the employer's community or reasonable geographic region. Id.

See also: Adams v. City of Shreveport, 27,284, p. 2 (La.App. 2 Cir. 8/23/95); 660 So.2d 127, 128, writ not considered, 95-2433 (La. 12/8/95), 664 So.2d 417.
Thus, in determining eligibility for Supplemental Earnings Benefits, the burden initially is on the firemen to show that they are unable to earn wages equal to ninety percent or more of the wages they earned before they sustained job related injuries. Smith v. Louisiana Dept. of Corrections, supra.[2]
The plaintiffs cited Miller v. Roger Miller Sand, Inc., 94-1151, p. 9-10 (La.11/30/94) 646 So.2d 330, but it does not support their claims. Miller states that the worker has the "initial burden of proving entitlement to supplemental earning benefits" by proving "by a preponderance of the evidence that the work-related injury has resulted in his or her inability to earn wages equal to ninety percent or more of the wages he or she was earning at the time of the injury." Id., 646 So.2d at 335 and 340. The plaintiff in Miller bore his burden of proving that he was unable to earn 90% of his pre-injury wages:
Three medical doctors examined plaintiff, and each one concluded that he was significantly disabled, due solely to the injury caused by the work-related fall.... [T]he plaintiff presented deposition testimony of a vocational rehabilitation counselor, *439 Jeffrey Peterson, indicating that plaintiff is not currently employable, considering the effects of the work-related accident..., as well as plaintiff's age and limited education. Peterson stated: "For all practical purposes, the only jobs that we are able to find would be some very minimal jobs at a light occupational level, and these jobs generally do not exist in any significant numbers, at least especially in the local economy." Peterson also testified that he "would not advise retraining at this point" because of plaintiff's age and limited education. [Emphasis added.]
Based on the foregoing, we find that plaintiff has proven by a preponderance of the evidence that, due to his fall at work, he is unable to earn ninety percent or more of his pre-injury wages. [Emphasis added.]
Id. at 336.
Pinkins v. Cardinal Wholesale Supply, Inc., 619 So.2d 52 (La.1993), does not support the position despite the following language:
It is the employer's burden to establish earning capacity when the employee is not working or earning less than the employee is able to earn as the result of job related disability. Daigle v. Sherwin-Williams Company, 545 So.2d 1005 (La.1989).

Id. at p. 56.
In order to be properly understood, this language must be placed in context by reading the passages that preceded it:
Lawrence Pinkins, Sr. was 60 years old on the day that this matter came on for trial. He had been employed by Cardinal Wholesale Supply, Co. for 25 years as a delivery truck driver. His prior work history is that of a heavy laborer since he was 16 years of age. Mr. Pinkins is a black male with a sixth grade education. He is marginally literate, and capable of performing simple addition and subtraction. [Emphasis added.]

* * * *
Plaintiff established through his vocational rehabilitation expert, Dr. Gorman, that he is unemployable. Even though, plaintiff's physician considered the position of "cashier" as one which plaintiff could perform given his limitations and restrictions, Dr. Gorman ruled out this gainful employment as a cashier. [Emphasis added.]
Id. at p. 54 and 56.
The Supreme Court found that:
[U]nder the facts presented by this particular case only, due to the totality of factors related to a realistic appraisal of access to employment, this claimant's marginal literacy, age and work related disability, that Mr. Pinkins has experienced a loss in wage earning capacity within the meaning of LSA-R.S. 23:1221(3)(a). Our review of the record reveals that plaintiff proved by clear and convincing evidence that his work-related injury has disabled him to the extent that he is unable to earn 90% or more of the wages he received at the time of the injury. [Emphasis added.] There is no evidence by the employer that Pinkins was able to perform work that was offered to him or was available to him in the employee's or the employer's community or a reasonable geographic region.
Id. at p. 55.
Thus when Pinkins is read in its entirety it becomes clear that the burden of proof shifts to the employer only after the employee has proven that he cannot earn 90% or more of the wages he received at the time of the injury.
That this reading of Pinkins is correct is made clearer still by reading Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989), upon which Pinkins relied:
The injured employee thus bears the burden of proving by a preponderance of the evidence that the injury resulted in his inability to earn that amount. The analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that worker's compensation law is to be liberally construed in favor of coverage. "In determining if an injured employee has made out a prima facie case of entitlement to supplemental *440 earnings benefits, the trial court may and should take into account all those factors which might bear on an employee's ability to earn a wage." [Emphasis added.]
Daigle, 545 So.2d at 1007.
In Daigle the plaintiff established his prima facie case by introducing evidence of his unsuccessful attempts to find employment in which he could earn at least 90% of his preinjury earnings in fields compatible with his physical limitations.
This Court held in Schmitt v. City of New Orleans, 632 So.2d 367, 374 (La.App. 4 Cir.1993):[3]
The only remaining [issue] is supplemental earnings benefits.
In order to establish entitlement to these benefits, a claimant must show that because of his injury, he is no longer able to earn wages equal to ninety per cent or more of the wages earned prior to injury. Since the record contains no testimony concerning the appellee's educational level, previous training, or work experience, we are unable to determine if he might be entitled to Supplemental Earnings Benefits (SEB) under La. 23:1221(3). [Emphasis added.]
Since the appellee made no prima facie case of entitlement to permanent total, or supplemental earnings benefits, the trial court erred in ordering the City to continue to pay appellee weekly benefits.
See also Smith v. Hamp Enterprises, Inc., supra.

THE FACTS CONCERNING EACH CLAIMANT
1. Ronald BarreBarre's motion for summary judgment alleges the following:
He was originally injured at a fire on March 29, 1987, when he fell and landed on a tank on top of his air mask. He was treated by Dr. Russell Levy. Dr. Levy diagnosed lumbosacral syndrome and cervical sprain. He returned to work after a visit to Dr. Levy on June 15, 1987.
On June 8, 1988, he returned to Dr. Levy when he injured his back jumping a fence during a fire on May 26, 1988. Dr. Levy took him off work. After continued treatment, Dr. Levy felt Barre was disabled from firefighting as of his September 8, 1988 examination.
Barre was examined by Dr. Gordon P. Nutik. Dr. Nutik diagnosed chronic low back strain which is superimposed on early degenerative changes at the L-4, L5-sacral discs. There was mild restriction of low back motion. Dr. Nutik did not feel he could return to firefighting and suggested light duty.
The record reveals the following:
The only information about Barre's injury, accident, and disability contained in his affidavit is the date of his accident, 5/26/88 and the following statement:
I was fighting a fire in the rear of a one story residence at 352 22nd Street when I climbed a three foot high fence and jumped into the rear yard hurting my lower back and neck when I hit the ground, causing pain for which I sought medical treatment from Dr. Levy.
Barre's injury report is consistent with his affidavit. However, there is nothing in the record concerning Barre's educational and training background or non-firefighting job potential, other than the following statements found in doctors' reports. Dr. Gordon Nutik's stated in his report dated October 4, 1988:
I felt that it was unlikely that he was a good candidate for rehabilitation back to firefighting duty and would advise that he pursue a lighter type of occupation.
Dr. Russell Levy wrote in a report dated 10/6/88 that:
I still think he is disabled from being a fire fighter. I will see him one more time in six weeks and probably discharge him again. I understand his retirement is going *441 to go through. He is told that when he does go back to work it should be in a nonheavy duty type of line of work.
There is nothing in the record from which Barre's "non-heavy duty" work potential can be determined. There is no evidence concerning his educational background, training or job experience. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. He has failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Barre on motion for summary judgment.
2. Donald A. BrownBrown's motion for summary judgment asserts the following:
Brown consulted Dr. Courtney Russo after an injury where he slipped on a fire scene of March 26, 1985. Brown fell while on the job at the fire department, striking his elbow and pulling his back. Brown was diagnosed as having an elbow strain and bruise along with a sprained back. Dr. Russo's final diagnosis was chronic bursitis/tendonitis, arthritis of the elbow, lumbosacral strain and spondylosis or arthritis of his lower back. Brown is precluded from lifting anything over 25-30 pounds; bending or reaching; pulling and pushing over 25-30 pounds; and climbing of ladders. He is disabled from firefighting. His accident of March 26, 1985 aggravated as well as exacerbated his back condition. His accident directly caused his elbow injury.
The record reveals the following:
The only information about Brown's injury, accident and disability contained in his affidavit is the date of his accident, 3/26/85 and the following statement:
While responding to a call at 1100 Florida Boulevard, I went to get portable radio out of trunk of car and slipped and twisted my back and hit right elbow on car, causing pain for which I sought medical treatment from Dr. Russo.
Dr. Gordon Nutik in a report dated December 2, 1985 stated that:
Because of this patient's intractable symptoms about the right elbow and because of the degenerative disc disease about the lumbosacral spine, I feel that this patient would be restricted from heavy repetitive lifting, climbing or stooping which would be required of an active fireman. [Emphasis added.]
Brown's injury report is consistent with his affidavit. Dr. Russo's deposition is consistent with the allegations made in Brown's motion for summary judgment. However, there is nothing in the record concerning Brown's educational and training background or non-firefighting job potential. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. Brown failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Brown on motion for summary judgment.
3. Joseph BruscatoBruscato's motion for summary judgment alleges the following:
He was treated by Dr. Robert Ruel, starting February 5, 1990. An MRI performed on March 23, 1990 indicated right lateral disc herniation at C6-7 causing mild impingement upon the neuroforamen and a small disc herniation at C5-6. On April 25, 1990, Dr. Ruel determined that Bruscato was disabled from firefighting duties. He is prohibited from overhead lifting, repetitive use of the arms, carrying weighted objects unnecessarily, or unnecessary pushing, or pulling. He is discouraged from repetitive lifting over ten pounds. Dr. Ruel felt Bruscato's accident was the major causing factor of his symptomatology.
The record reveals the following:
The only information about Bruscato's injury and accident contained in his affidavit is the date of his accident, 2/03/90 and the following statement:
While carrying mattress from fire at 3500 Florida Avenue, I felt sharp pain in my left shoulder as I attempted to get out. I sought medical treatment from Dr. Ruel.
Bruscato's injury report is consistent with his affidavit. Dr. Ruel's deposition is consistent *442 with the allegations made in Bruscato's motion for summary judgment, except that when questioned about Bruscato's repetitive lifting limitations, Dr. Ruel testified that on occasion Bruscato could handle weights in the 45 to 50 pound range. It is only when the repetitive lifting is to be done on a regular basis that Dr. Ruel would restrict Bruscato to a maximum of ten pounds.
There is nothing in the record concerning Bruscato's educational and training background or non-firefighting job potential. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. Bruscato failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Bruscato on motion for summary judgment.
4. John BurkartBurkart's motion for summary judgment alleges the following:
Burkart saw Dr. Ruel on March 8, 1990. An MRI dated March 27, 1990 showed herniations at C3-4, C5-6, and C6-7. Dr. Ruel then classified Burkart as not capable of firefighting. Burkart's limitations include avoiding unnecessary lifting, pushing, pulling, repetitive movement of the head, carrying weighted objects, only occasional lifting of 35 to 45 pounds and no repetitive lifting over 10 to 15 pounds.
The record reveals the following:
The only information about Burkart's injury, accident and disability contained in his affidavit is the date of his accident, 12/11/89 and the following statement:
While supervising firefighting in a structure located at 827 8th Street, I tripped on fire hose and landed on my left shoulder and arm, causing pain for which I sought medical treatment from Dr. Ruel.
Burkart's injury report is consistent with his affidavit. Dr. Ruel's deposition is consistent with the allegations made in Burkart's motion for summary judgment. However, there is nothing in the record concerning Burkart's educational and training background or non-firefighting job potential. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. Burkart failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Burkart on motion for summary judgment.
5. James G. ClementClement's motion for summary judgment alleges the following:
Clement was originally treated by Dr. William Pusateri after injuring his elbow while laying fire hose for a hydrant. He transferred to Dr. Ruel on January 14, 1991 for treatment of his injury which occurred while pulling a hose at work. Dr. Ruel diagnosed ulnar nerve tardy and lateral epicondylitis. The accident of July 28, 1990 produced these symptoms. After conservative treatment, surgery was performed on February 27, 1991. While Clement improved, he continued with pain. On May 30, 1991, Dr. Ruel felt Clement could no longer work as a firefighter. He was prohibited from repetitive use of the arms, lifting overhead and no stress to the elbow as of May 24, 1993. Clement continues to be symptomatic.
On February 6, 1991, Dr. Nutik agreed with Dr. Ruel that Clement has "tennis elbow" and ulnar neuropathy of the left elbow after the accident at work. On February 26, 1991, Dr. Nutik agreed with Dr. Ruel that surgery would be the best treatment. On June 27, 1991, Dr. Nutik found that Clement had mild restriction with extension of range of motion of the left elbow, residual subjective complaints of pain and weakness. Dr. Nutik could not opine regarding Clement's prognosis.
The record reveals the following:
The only information about Clement's injury, accident and disability contained in his affidavit is the date of his accident, 7/28/90 and the following statement:
While pulling hose line to hydrant to hook up for fire at 1010-1014 Nunez, I twisted my left elbow, causing pain for which I sought medical treatment from Dr. Ruel.
Clement's injury report is consistent with his affidavit. Dr. Ruel's deposition is consistent *443 with the allegations made in Clement's motion for summary judgment, except for the fact that Dr. Ruel used the term "overuse" rather than "repetitive use" when describing Clement's proscribed activities. Whether there is any significance in this difference in terminology in the context of Clement's alternative work potential is impossible to determine at this stage of the proceedings. However, there is nothing in the record concerning Clement's educational and training background or non-firefighting job potential. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. Clement failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Brown on motion for summary judgment.
6. Robert J. ComeauxComeaux's motion for summary judgment alleges that:
Dr. Jack Ruli saw Comeaux on November 2, 1988 after Comeaux blacked out and slid down a ledge approximately thirty feet. Comeaux was admitted to Mercy Hospital from November 2, 1988 through November 8, 1988. Dr. Ruli diagnosed syncope with cardiac arrhythmia, consisting of multiple ventricular ectopic beats, symptomatic of ventricular tachycardia. Based on this diagnosis, Dr. Ruli felt he was disabled from firefighting. Comeaux is prohibited from climbing heights or situations where he might fall or have a syncopal episode. Exposure to heat, smoke, and stress could precipitate or aggravate this condition.
Comeaux was also treated for orthopedic injuries from the same fall by Dr. Raymond F. Kitziger who diagnosed a soft tissue sprain of the lumbar spine superimposed on a preexisting degenerative change.
The record reveals the following:
The only information about Comeaux's injury, accident and disability contained in his affidavit is the date of his accident, 11/01/88 and the following statement:
While on stand-by at a fuel leak at Lakefront Airport and in full gear and M.S.A. scuba, I felt my heart begin to race and felt faint and nauseous, then I fell down an embankment that I was standing on, causing pain for which I sought medical treatment from Dr. Ruel.
Comeaux's affidavit contains no information about his educational background, training, job experience or skills, or injuries arising out of the accident.
The first injury report is consistent with this affidavit.
In a letter to Superintendent McCrossen dated December 29, 1988 Dr. Jack P. Ruli stated:
Because [Comeaux] sustained a syncopal episode while on duty with the Fire Department and because he does have associated ventricular arrhythmias. [sic] I feel that Mr. Comeaux should not return to fireduty. In addition, he has a substernal thyroid which I believe may be contributing to his respiratory problems. In view of these diagnoses, I consider Mr. Robert Comeaux totally and permanently disabled from engaging in fire duty.
On May 13, 1991 in a letter to New Orleans Rosenbush Claims Service, Inc. Dr. Ruli stated:
I last saw [Comeaux] on March 14, 1991. At that time, he was doing well. His blood pressure was 130/80. His physical examination was normal. There were no cardiac arrhythmias. His serum cholesterol at that time was 208 mg% which is only slightly elevated. As you know he has a history of recurrent ventricular arrhythmias. Fortunately, he has not had any recent problems.
In November of 1990, he had an electrocardiogram which was essentially normal. In November of 1990, he had a lipid profile done which was slightly abnormal.

* * * *
At the present time, Mr. Comeaux is not taking any cardiac medications. He has been instructed to take one aspirin per day for its anticoagulant effect. I will see him again in approximately 3 months.
On August 5, 1993, Dr. Ruli made another report to the Rosenbush Claims Service:

*444 Mr. Comeaux was last seen in my office on June 17, 1993. At that time he was doing quite well. He has been on a diet and lost down to 171 lbs. The patient did not have any significant systemic symptoms. His physical examination revealed a BP of 120/80. The heart rhythm was basically regular with a rare ectopic beat. There were no other pertinent findings. Test results at this time reveal a normal lipid profile. An EKG revealed slight lowering of the T-waves in T-V5 and T-V6. There was a rare ventricular ectopic beat. This EKG was only mildly abnormal and certainly not diagnostic. [Emphasis added.]
I recommended that he have a chest x-ray and a treadmill stress test prior to his next visit. He is currently not on any cardiac medications. [Emphasis added.]
The discharge summary from Mercy Hospital states that:
He had his air tank on and apparently sustained trauma to his chest and back. He was taken to the Emergency Room and subsequently admitted to the hospital. Multiple x-rays were taken and apparently reported as negative. [Emphasis added.]
Dr. Ruli's "History and Physical Examination" of 11/1/88 noted that Comeaux was:
[A] well developed, well-nourished patient who is alert and communicating well. He denies blurred vision or headache.
His blood pressure was 130/85 and his pulse was 68 beats per minute. His lungs were clear and his abdomen was "negative." He had good movement in all extremities. Comeaux revealed "some left posterior rib soreness, as well as soreness over the lower lumbar spine and left sacroiliac region." Dr. Ruli's impression was:
Syncope undetermined etiology, possibly secondary to cardiac arrhythmias. Multiple contusions to rib cage and lumbar spine secondary to the syncopal episode.
Comeaux's attorney deposed Dr. Ruli:
Q. Based on his diagnosis, have you placed any limitations on him?
A. At the present time, I feel that he should be allowed to do whatever he can comfortably do. [Emphasis added.] I do not feel that he should climb any heights or expose himself to any situations where he could be a danger to himself or other persons if he should fall or have a syncopal episode.
Q. Does he remain disabled from firefighting?
A. Yes, because of the possibility that this could occur again.
Q. Do you have an opinion as to whether his firefighting history caused or contributed or aggravated his condition?
A. I don't know whether it caused it or not, but certainly exposure to heat, smoke, and stress could precipitate or aggravate ventricular irritable ectopia in a person who is prone to it.
Q. At the time that he had a syncopal episode, he was fighting a fire, wasn't he?
A. Yes, he was. Actually, let me get the exact situation. He wasn't doing that much. And so, fortunately, he wasn't in the top of a building. He was watering down a gasoline leak, and while standing on a ledge began to feel palpitations and fell 30 feet, and he was just watering down gasoline.
In his report of an office visit with Comeaux dated June 17, 1993, Dr. Ruli said that Comeaux was:
[D]oing well. Works as a ranger at City Park. Plays golf. No problem.
The only conclusions that the record will support are the following:
Comeaux had a fainting spell on November 1, 1988 and fell sustaining some trauma, but no fractures. Whatever impact trauma he sustained at the time appears to have been resolved in a short period of time. At the time of the injury the nature of the work he was doing was not so strenuous or under such adverse conditions (heat and/or smoke) as to enable Comeaux's physician to conclude that the fainting spell was related to the work he was performing. No significant cardiac problems have been noted in some time. An occasional minor irregularity caused Dr. Ruli to caution against employment involving *445 risk of fainting, but left open the door to what may be limitless other opportunities for which Comeaux may be well qualified. He can play golf, "no problem." We know of no educational, experiential, mental or other limiting factors or impediments to employment. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. We cannot tell what efforts if any Comeaux may have made to obtain employment.
Comeaux failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Comeaux on motion for summary judgment.
7. Robert CordesCordes' motion for summary judgment alleges the following:
Cordes felt chest and arm pain while fighting a fire. He was overexerting himself operating a flotilla pump. Cordes was taken to Methodist Hospital, where he was treated by Dr. Gary Bergeaux. He was diagnosed as having an inferior acute myocardial infarction.
Cordes was also seen by Dr. Charles Moore. Dr. Moore diagnosed coronary artery disease with three vessel involvement with an old inferior wall myocardial infarction. Dr. Moore felt Cordes was permanently disabled from fire duty as a firefighter. He could do light duty, but could have no exposure to smoke or sudden peak exertion.
Cordes has been followed by Dr. Victor Echenique, who also diagnosed a previous myocardial infarction, coronary artery disease, mild hyperchotislerolemia with a high cholesterol HDL ratio and a history of hypertension. Dr. Echenique found Cordes disabled from firefighting. The doctor also felt that job stress could precipitate another myocardial infarction.
As a 27-year veteran of the Fire Department, Cordes is entitled to the benefits of the presumption of causation as defined in LSA-R.S. 33:2581.[4]
The record reveals the following:
The only information about Cordes' injury and accident contained in his affidavit is the date of his accident, 9/27/85 and the following statement:
While operating a flotilla pump at a fire San Marco and Chef Menteur Highway, I felt pain in my chest and arm. I sought medical treatment from Dr. Echenique.
Cordes's injury report is consistent with his affidavit. Dr. Echenique's deposition is consistent with the allegations made in Cordes's motion for summary judgment. Although there is nothing in the record concerning Cordes's educational and training background or job potential, the threat of another heart attack brought on by job stress is sufficient to establish a prima facie case of disability preventing Cordes from being able to find employment within the limitations of his disability at which he could earn at least 90% of his pre-disability earnings. The burden shifts to the City to show that Cordes had such an earnings potential, or to at least show that a genuine issue of material fact exists. As this Court said recently in Smith v. Hamp Enterprises, Inc.: "We recognize that the more obviously and severely disabling an injury is, the less extrinsic evidence should be required to establish an initial prima facie case of entitlement to Supplemental Earnings Benefits." The City failed to introduce any affidavits, depositions, etc. to controvert Cordes' evidence. The City's mere pleadings and arguments to the contrary are insufficient to raise a genuine issue of material fact.
Therefore, it was not error for the hearing officer to grant Cordes' motion for summary judgment.
8. Joseph Cosentino, Sr.Cosentino's motion for summary judgment alleges the following:
Cosentino was injured when he fell while climbing out of a truck after a training lesson. *446 He injured his right upper arm. Cosentino has been treated for a rupture of the long head biceps tendon by Dr. George Murphy starting October 15, 1987. Despite surgery on February 3, 1988, Consentino never regained full use of the shoulder. His condition has worsened and he presently awaits several tests needed to evaluate the worsening. Dr. Murphy said that his accident at work caused the torn cartilage and biceps tear which plague Cosentino. Cosentino is prohibited from lifting overhead, lifting, repetitive actions or heavy activity with the right upper extremity. He is permanently disabled from firefighting.
The record reveals the following:
The only information about Cosentino's injury and accident contained in his affidavit is the date of his accident, 10/15/87 and the following statement:
While climbing out of the trunk after training, my foot slipped off of step, causing pain for which I sought medical treatment from Dr. Murphy.
Cosentino's injury report is consistent with his affidavit. Dr. Murphy's deposition is consistent with the allegations made in Cosentino's motion for summary judgment. Dr. Murphy also noted in his deposition that Cosentino is right handed, the implication being that the injury to his right shoulder and arm is consequently more disabling. However, in a report dated May 31, 1991 Dr. Murphy noted that:
[Cosentino] reported that occasionally he got a shooting type symptom from his neck all the way into his fingers, and it sounds like he may be getting occasional irritation to a cervical nerve root which would not be related to the shoulder problem for which he is normally followed." [Emphasis added.]
Therefore, when Cosentino argues in his motion for summary judgment that his condition is worsening, the cause of that worsening may not be work-related and may be non-compensable. In his deposition taken several years after this report, Dr. Murphy indicates that it is possible that the new symptoms experienced by Cosentino could be related to his earlier injury, but the issue cannot be resolved on this motion for summary judgment.
Moreover, there is nothing in the record concerning Cosentino's educational and training background or non-firefighting job potential. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. Cosentino failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Cosentino on motion for summary judgment.
9. Fred DrouantDrouant's motion for summary judgment alleges that:
Drouant inhaled smoke and superheated gases while working as a fire captain. He was treated by Dr. Jack Ruli as of February 6, 1985. He was diagnosed as having chronic bronchitis. Drouant could not return to work as a fireman due to his chronic bronchitis. Occupational exposure to excessive heat, various pollutants and smoke could have caused or aggravated this condition. Drouant is limited by asthma and bronchitis attacks.
Drouant was also seen by Dr. Brooks Emory. Dr. Emory diagnosed reactive airways disease or asthma of a nonallergic variety. This condition is aggravated by smoke and smoke inhalation. Dr. Emory could not determine if his condition was caused by his occupation, but said it would be aggravated by firefighting. In a supplemental report sent to Dr. Ruli, Dr. Emory felt Drouant was disabled from firefighting.
The record reveals the following:
The only information about Drouant's injury and accident contained in his affidavit is the date of his accident, 12/13/83 and the following statement:
While ventilating building at 2309 Clovet, I inhaled smoke and superheated gases. I sought medical treatment from Dr. Ruli.
Drouant's injury report is consistent with his affidavit. Dr. Ruli's deposition is consistent with the allegations made in Drouant's motion for summary judgment. However, Dr. Ruli's deposition testimony implies that *447 Drouant's non-firefighting restrictions are not very limiting:
Q. Have you put any physical restrictions on him?
A. I think he goes at his own pace. He certainly should avoid any type of occupation where he would be exposed to any unusual fumes or irritants.
Q. Does he have any exertional limitations?
A. He's limited only as far as his symptoms are concerned. I have not placed any limitations on him. [Emphasis added.] He does pretty much what he feels as though he can do, with the understanding that he avoid exposure to pollutants.
There is nothing else in the record concerning Drouant's educational and training background or non-firefighting job potential. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. Drouant failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Drouant on motion for summary judgment.
10. Nolan J. ExstersteinExsterstein's motion for summary judgment alleges the following:
Dr. Courtney Russo first examined Exsterstein on November 29, 1989. Exsterstein related a snap of the knee and back while moving heavy generators on November 11, 1989. Dr. Russo diagnosed a cervical sprain and a sprained neck. Exsterstein has continued seeing Dr. Russo every two months since the injury. He was last seen by Dr. Russo on November 23, 1992. Dr. Russo has prohibited Exsterstein from working above eye level, no climbing of ladders, no squatting or stooping, lifting over 25-30 pounds, no bending, no reaching, no pulling or pushing over 25 pounds. Exsterstein is disabled from firefighting. He may need a knee replacement in the future. The accident of November 11, 1989 either started the problems or aggravated a preexisting condition which was non-symptomatic.
Exsterstein was also seen by Dr. George Byram. He diagnosed tendonitis of the left shoulder and osteoarthritis of the left knee. Dr. Byram limited him to light duty.
The record reveals the following:
The only information about Exsterstein's injury, accident, and disability contained in his affidavit is the date of his accident, 11/15/89 and the following statement:
While delivering two portable generators and three portable Hale pumps for repair to the Equipment Maintenance Division, I strained my left shoulder and left knee, causing pain for which I sought medical treatment from Dr. Russo.
Exsterstein's injury report is consistent with his affidavit. Dr. Russo's deposition and Dr. Byram's reports are consistent with the allegations made in Exsterstein's motion for summary judgment. However, in a report dated October 1, 1990, approximately six months after Dr. Byram qualified Exsterstein for light duty work, Dr. Byram stated that:
I think [an] MMPI and a personality inventory might be helpful in determining his interest in returning to some form of gainful employment.
It is impossible to tell at this stage of the proceedings whether Dr. Byram might be referring to more than light duty work when he refers to "gainful employment." There is nothing in the record concerning Exsterstein's educational and training background or non-firefighting job potential. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. Exsterstein failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Exsterstein on motion for summary judgment.
11. Francis FathereeFatheree's motion for summary judgment alleges the following:
Fatheree injured his neck and shoulders while pulling down a ceiling. A chandelier fell on his head and shoulders. He was treated by Dr. Robert Ruel starting March 28, 1989. Fatheree was treated conservatively *448 for pain in the cervical, lumbar and thoracic levels of the spine. On June 26, 1989, an MRI showed a bilateral post-lateral disc bulge at L4-5 with evidence of early disc dehydration and disc degeneration. Dr. Ruel felt Fatheree was disabled from firefighting duties. Fatheree was precluded from any type of work activity. He should avoid unnecessary lifting, prolonged standing, prolonged sitting, repetitive bending, twisting movements, unnecessary climbing, lifting in excess of 45-50 pounds on any one occasion, and carrying objects over 10-20 pounds. The accident of March 1989 was the cause of Fatheree's symptoms and ongoing problems. He has no history of back problems.
The record reveals the following:
The only information about Fatheree's injury and accident contained in his affidavit is the date of his accident, 3/21/89 and the following statement:
While pulling down ceiling with pike, ceiling and chandelier fell on my head and shoulders, causing pain for which I sought medical treatment from Dr. Ruel.
Fatheree's injury report is consistent with his affidavit. The facts urged in the motion for summary judgment appear to be a paraphrase of Dr. Ruel's deposition. However, the tone of Dr. Ruel's deposition is more positive. Where Fatheree's motion for summary judgment alleges that he is precluded from "any work activity," Dr. Ruel's actual words were "any labor-type work activity." [Emphasis added.] Dr. Ruel's report dated October 12, 1991 states that:
I had a rehab conference on [Fatheree] July 1, 1991 and advised that he should not perform labor work such as that of a fireman but that he could perform sedentary work. [Emphasis added.]
There is no other information in the record about Fatheree's educational and training background or non "labor-type" work potential. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. Fatheree has failed to establish a prima facie case that he is disabled from obtaining employment earning at least 90% of his firefighting income. Thus this issue remains as a genuine issue of material fact. Therefore, it was error for the trial court to find in his favor on motion for summary judgment.
12. Gerald GervaisGervais's motion for summary judgment alleges the following: Gervais saw his family physician, Dr. Farrell Nicholson, for chest pain. He was referred to Dr. Charles Steiner for diagnosis and treatment. On August 25, 1987, Gervais was diagnosed with intermittent rapid atrial fibrillation, history of palpitations and new onset external substernal chest discomfort associated with dyspnea. He subsequently underwent coronary angiography, heart cauterization and later coronary bypass. Dr. Steiner felt Gervais cannot return to fire duty. He continued cardiac care under Dr. James Lam when Dr. Lam left Dr. Steiner's group. Dr. Lam diagnosed left ventricular dysfunction, left ventricular and left atrial dilation, diastolic dysfunction and moderate hypokinesia of the anterior and apical segment. Gervais is disabled as a firefighter.
The record reveals the following:
The only information about Gervais's injury and accident contained in his affidavit is the date of his accident, 9/22/87 and the following statement:
I was experiencing constant chest pains and sought medical treatment from Dr. Steiner by undergoing a stress test, angiography, and then coronary artery bypass surgery.
Dr. Lam's gave the following pertinent testimony when deposed:
Q. Have you placed any physical limitations on him because of his condition?
A. Some. I certainly think he's to avoid heavy lifting, anything over 50 pounds or so, dietary restrictions, you know.
Q. Does he have any limitation in terms of climbing, such as stairs, things of that nature?
A. We did do a stress test. Not too much. Actually, he did a fairly good stress test in February of '93.
When asked if he thought that Gervais' occupation as a firefighter was a contributing factor to his disability, Dr. Lam replied:
Possible. But it's difficult to say. Certainly stress does have a part in regards to *449 heart conditions and stress on the heart muscle.
Other than stating that Gervais should not continue work as a firefighter which is a particularly physically demanding occupation, the only limitation that Dr. Lam placed on Gervais's job related activities was to refrain from heavy lifting of objects over fifty pounds. There is nothing else in the record to show that by reason of training, education or job availability that Gervais could not have obtained other gainful employment earning at least 90% of his firefighting income. In the absence of such a showing, Gervais has failed to establish a prima facie case of entitlement to Supplemental Earnings Benefits. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. A genuine issue of material fact continues to exist on that issue. Therefore, it was error for the hearing officer to award summary judgment in favor of Gervais.
13. Willie L. JohnsonJohnson's motion for summary judgment alleges the following:
Johnson was originally treated by Dr. Kenneth Veca. On February 16, 1989, Dr. Veca sent Johnson to Dr. Ruel for consideration for surgery for a disc problem which both doctors believe Johnson developed after lifting an air mask at work on April 8, 1986. Johnson attempted to work after conservative treatment. He again injured his back on January 5, 1990, lifting a five gallon bucket of water at work. He was diagnosed with nerve root impingement from those accidents on June 4, 1990 in an EMG study. An MRI on June 5, 1990 showed partial disc degeneration at L3-4, L4-5 and L5-S1, and herniation at L4-5, which was the object of surgery. A bilateral discectomy was performed on July 10, 1990 at C4-5. When his symptoms continued in September of 1990, Dr. Ruel said Johnson was not capable of working as a firefighter. His work injuries of April 4, 1986 and July 10, 1990 led to his surgery and retirement. According to Dr. Ruel, Johnson must avoid prolonged standing, sitting, repetitive bending, unnecessary climbing, rotatory movement of the trunk, unnecessary lifting, pushing, pulling, repetitive movement of the feet, lifting over 40-50 pounds at one time and carrying weighted objects unnecessarily.
The record reveals the following:
The only information about Johnson's injury and accident contained in his affidavit is the date of his accident, 4/08/86 and the following statement:
While at 6038 St. Charles Avenue, I picked up air mask case from compartment on pump and had a sharp pain in upper and lower back, causing pain for which I sought medical treatment from Dr. Veca.
Johnson's affidavit contains no information about his educational background, training, job experience or skills, or injuries arising out of the accident.
By letter dated June 12, 1993, Dr. Ruel reported that:
On January 18, 1993 [Johnson] returned. He reported intermittent back symptoms but it felt like his legs were getting weaker. He was walking and riding a bike for exercise. Although he felt that the [nonemployment related automobile] accident of September [8, 1992] aggravated his back, he felt that he was pretty much at a point with his back as he was prior to the accident. On examination of his back he had excellent range of motion with no muscle spasm or list. He was able to heel-and toe walk without difficulty. The straight leg raising test bilaterally caused some low back discomfort.
He was last examined for his back on April 23, 1993. He was having some aching in his hips and legs as well as his low back. On examination he had good motion and no list. He was able to get on and off the examining table well. The straight leg raising test bilaterally caused posterior thigh pain. He reported occasional numbness occurring in his legs. He also had a pain radiating down the lateral side of the right leg to the lateral ankle. I recommended that he return in three to four months as necessary.
In a report dated January 14, 1991 Dr. Ruel observed that:
[Johnson] was last examined on January 4, 1991. He was experiencing occasional pain in both heels in addition to both legs *450 after walking on a hunting trip. He was not having leg pain at the time of my examination. On examination of the back, range of motion was good and there is no sciatica. He had good tone in his back muscles and good strength in the lower extremities. I suggested that he stop his job driving a bus as I felt it was possibly causing back discomfort.
He is unable to work as a fireman.
In his report of March 25, 1992, Dr. Ruel stated that Johnson "is disabled as a labor type worker and has no other medical disability to my knowledge. He could do some light working job activities that would avoid prolonged standing, sitting, frequent bending, repetitive lifting and climbing.... He is disabled as a fireman."
In his report of April 26, 1991 Dr. Ruel stated that:
I had a rehabilitation conference on this patient on March 4, 1991 with Ms. Baker. I indicated to her that he could be trained at some job activity that would allow him to sit and stand at will, and that would prevent repetitive bending, frequent lifting, climbing, prolonged sitting, standing, and rotatory movements of his trunk. He was to avoid lifting more than 40 to 50 pounds on any one occasion.... He remains disabled and unable to work as a fireman.
In his deposition Dr. Ruel testified that:
[P]rior to that he had no problem, and it was my feeling at the time that the incident that he reported to me was the cause of his problem, and apparently was also Dr. Veca's opinion because he sent him to me for treatment.
* * * *
I think that his initial injury started things going, and he attempted to go back to work and had these repetitive incidents that would happen and cause further injury to his back, which subsequently led to surgery and his retirement.
Plaintiff introduced unsigned reports of visits with Dr. Kenneth L. Veca. The report for February 6, 1989 states:
[Johnson] was unable to work since January 31, 1989; however, it is felt he can return to work as of February 9, 1989.
The notes from the visits of March 16, 1989, April 20 1989, December 30, 1988, and December 17, 1988 all state that Johnson is able to perform his usual duties at work.
On April 17, 1986, the first date of a visit to Dr. Veca in the record shows that Johnson was "entirely asymptomatic." Dr. Veca authorized him to return to work. This was after the date of Johnson's accident.
According to the reports of Dr. Veca, Johnson was advised to discontinue work on July 1, 1986 when symptoms recurred, but was told he could resume work duties on July 4, 1986.
On August 18, 1986 Veca reported that:
The patient advised that ever since his injury on May 8, 1986 he has had some discomfort in the lower back, however he has not mentioned this to me previously.
On that date Dr. Veca opined that he felt that Johnson would be disabled through August 26, 1986.
Dr. Veca reported that he saw Johnson on August 25, 1986, and that he was capable of working at that time. On November 25, 1986 Dr. Veca advised Johnson to discontinue work until December 1, 1986. He was also unable to work from December 15, 1987 through December 22, 1987. Johnson was again advised not to work until January 3, 1987. On December 2, 1988 Dr. Veca stated that Johnson was not able to perform full duties. On December 16, 1988 Dr. Veca reported that Johnson could return to work on the next day.
On those occasions when Dr. Veca opines that Johnson cannot perform his duties as a fireman, he does not state the nature and extent of his physical limitations. We find nothing in those reports that raises a presumption that Johnson is incapable of performing non-firefighting related job duties compensable at a rate of at least 90% of preinjury compensation rate.
Johnson's injury report is consistent with his affidavit. Dr. Ruel's deposition is consistent *451 with the allegations made in Johnson's motion for summary judgment.
This is a much closer case. Dr. Ruel's recommendation in 1991 that Johnson give up his bus driving job because of back discomfort implies that Johnson's disability goes far beyond that of preventing him from returning to firefighting. However, there is nothing in the record concerning Johnson's educational and training background or nonfirefighting job potential. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. The failure of the City to offer countervailing affidavits and evidence does deprive the City of the benefits of the normal rules of summary judgment that all doubts and reasonable inferences be resolved in its favor. Johnson failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Brown on motion for summary judgment.
14. Merrill JuneauJuneau's motion for summary judgment alleges the following:
Juneau injured his lower back while practicing rescue procedures when he carried a crash victim from a simulated burning airplane. He consulted Dr. Robert Ruel on November 14, 1991 for back pain and pain radiating into his legs. An MRI performed February 11, 1991 indicated a midline disc herniation at L4-5 as well as L5-S1. A myelogram and CAT Scan revealed a broad based mild disc bulging at L3-4 and a disc bulge at L4-5, sacralization of the L-5 vertebra and narrowing at L5-S1. Dr. Ruel considered Juneau disabled from firefighting. Juneau's description of the accident of January 14, 1990 is consistent with his complaint of pain and discomfort. This accident caused his back problems. Juneau should avoid labor type work, repetitive bending, prolonged sitting, standing, repetitive bending, torsion of the trunk, lifting, repetitive pushing, pulling use of the feet repetitively, no lifting over 40-50 pounds on one occasion, and he should not carry weighted objects.
The record reveals the following:
The only information about Juneau's injury and accident contained in his affidavit is the date of his accident, 11/14/94 and the following statement:
While practicing rescue procedures in full turnout gear, I injured my lower back while rescuing a crash victim from a simulated burning airplane, causing pain for which I sought medical treatment from Dr. Ruel.
Juneau's injury report is consistent with his affidavit.
In a report dated July 12, 1991 Dr. Ruel noted:
[Juneau] told me that the week before he attempted to knock a wall down with a mallet at his home, while some reconstruction was going on and that he was unable to carry out that activity because of low back pain.
Dr. Ruel's deposition is consistent with the allegations made in Brown's motion for summary judgment. However, Juneau's attorney asked Dr. Ruel the following question when he deposed him:
Q. Did he have any other physical limitations besides his inability to work as a firefighter?
A. No.
There is nothing else in the record concerning Juneau's educational and training background or non-firefighting job potential. No one expressed any opinion about his ability to perform any other type of job. Juneau failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Juneau on motion for summary judgment.
15. William KernerKerner's motion for summary judgment alleges the following:
Kerner injured his lower back when he tripped over hose lines while fighting a fire. Kerner was treated by Dr. Kenneth Veca. On July 11, 1986, Dr. Veca diagnosed a disc protrusion compromising the left neuroforamen at the L4-5 level indicative of a herniation *452 at the L-4 disc. Dr. Veca felt it was not likely that Kerner would be able to return to fire duty. He is also limited from performing duties which would require prolonged sitting. On August 8, 1986, Dr. Veca notified the New Orleans Fire Department that Kerner was permanently disabled from firefighting as a result of his injury. This opinion remains through the duration of the records.
Kerner was also seen by Dr. Melvin L. Parnell, Jr., who diagnosed a lumbosacral strain.
The record reveals the following:
The only information about Kerner's injury and accident contained in his affidavit is the date of his accident, 7/12/85 and the following statement:
While directing a fire attack inside fire building at 5106 North Claiborne, I tripped over hose lines buried beneath debris and water and injured my lower back, causing pain for which I sought medical treatment from Dr. Veca.
Kerner's report of injury is consistent with his affidavit. Dr. Veca's reports are consistent with Kerner's summary judgment allegations. However, in the month's following his determination that Kerner could not work sitting for long periods, Dr. Veca noted first that Kerner could fast walk with some occasional jogging, and later that Kerner "is able to jog short distances about four times a week." It is difficult at this stage of the proceedings to tell exactly what Kerner's physical job limitations might be, and there is no evidence to tell us what his education, training and work experience might be. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra.
Kerner failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Kerner on motion for summary judgment.
16. W. Wayne KerthKerth's motion for summary judgment provides the following:
Dr. Ruel saw Kerth on July 19, 1988 when Kerth stepped through a floor while firefighting and sprained his ankle. Kerth was treated with pain medication and released for work on August 23, 1988 and discharged from treatment on December 29, 1988. Kerth again injured his ankle on August 18, 1989 when hot embers fell and burned his shoulder causing Kerth to jump from a step and again injure his ankle. He underwent surgery on March 7, 1990. Despite surgery, Kerth aggravated the nerves in the foot, which was diagnosed as Morton's neuroma. On May 22, 1990, Kerth was declared disabled from firefighting. His injury of August 18, 1989 was a contributing factor to his disease and disability. He is restricted from climbing, carrying heavy equipment and heavy objects. Dr. Ruel's deposition testimony supports these limitations and attributes them to his work related ankle injuries.
The only information about Kerth's injury and accident contained in his affidavit is the date of his accident, 08/18/89 and the following statement:
While supervising firefighting in the rear yard of 1676 North Claiborne and with all turnout gear on, hot amber fell down my collar causing burns to my neck and left shoulder. I slipped while trying to get out of my coat injuring my right ankle, causing pain for which I sought medical treatment from Dr. Ruel.
In a letter dated December 28, 1990 covering treatment for the period from May 22, 1990 through the date of the letter, Dr. Ruel said that by August 13, 1990, Kerth was experiencing problems from Morton's neuroma but that his ankle "was relatively asymptomatic at that time." When Kerth returned on October 23, 1990, Dr. Ruel reported that:
He was having some discomfort in the Morton's neuroma area over the third and fourth metatarsal head regions. His ankle was doing relatively well, but he had some discomfort in the retrocalcaneal bursa of the heel region intermittently. Range of motion of the foot and ankle was good.
In this same letter, Dr. Ruel informed the fire department that he would see Kerth again in four to six weeks, during which time he would remain out of work. In the "Physician's Supplementary Report" dated August *453 13, 1990, Dr. Ruel states that Kerth's only problem is neuroma.
In a letter dated May 22, 1990 Dr. Ruel stated that:
I feel that Mr. Kerth will have residual discomfort in the right ankle which will persist and hinder any climbing. For that reason, I feel that he should retire from the Fire Department. He will also, most likely, require additional surgery of the right foot in the future for Morton's neuroma.
Dr. Ruel attributed the neuroma to the change in Kerth's gait arising out of his ankle surgery. As the ankle surgery arose out of a work related injury, we can consider the neuroma to be work related.
The surgery consisted of the removal by Dr. Ruel of excessive synovial tissue in the area of symptoms as well as a small bony spur both of which were removed surgically. The surgery was performed on an outpatient basis under local anesthesia. The diagnosis was right ankle sprain. Dr. Johnson, a radiologist found no evidence of fracture or dislocation.
Dr. Ruel testified that he expected Kerth to remain disabled as a firefighter, but he expressed no opinion regarding other occupations other than describing the physical limitations discussed previously.
Kerth's injury report is consistent with his affidavit. Dr. Ruel's deposition is consistent with the allegations made in Kerth's motion for summary judgment. However, there is nothing in the record concerning Kerth's educational and training background or job potential. No one expressed any opinion about his ability to perform any other type of job. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra.
Kerth failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Kerth on motion for summary judgment.
17. James L. MilanoMilano's motion for summary judgment alleges the following:
Milano has been treated by Dr. Charles Moore who diagnosed Milano with idiopathic cardiomyopathy with congestive heart failure. Milano is totally and permanently disabled. Milano is a candidate for a heart transplant.
As a thirty-one year veteran of the Fire Department, he is entitled to the presumption of causation provided by LSA-R.S. 33:2581.
The only information about Milano's injury and accident contained in his affidavit is the date of his accident, 4/17/90 and the following statement:
"During thirty-one (31) years of firefighting, I have acquired chronic lung disease and congestive heart failure. I sought medical treatment from Dr. Moore.
Milano made the same allegation of causation in his initial injury report.
A letter from Dr. Charles B. Moore dated March 19, 1991 states that Milano was scheduled to be evaluated as a heart transplant candidate. By letter dated October 5, 1990 Dr. Moore stated that:
[Milano] suffers from a dilated idiopathic cardiomyopathy with congestive heart failure and has been declared permanently and totally disabled to perform any occupation at the present time. [Emphasis added.]
This is sufficient to discharge Milano's initial burden of proof. As this Court said recently in Smith v. Hamp Enterprises, Inc., supra: "We recognize that the more obviously and severely disabling an injury is, the less extrinsic evidence should be required to establish an initial prima facie case of entitlement to Supplemental Earnings Benefits." The burden shifts to the City which has failed to offer any countervailing affidavits or other evidence that would raise a genuine issue of material fact. It was not error for the hearing officer to grant Milano's summary judgment motion for Supplemental Earnings Benefits.
18. Frederick RappRapp's motion for summary judgment alleges the following:
Rapp was treated by Dr. Raymond Kitziger for degenerative changes in the medial *454 compartment of the right knee. He had a medial meniscectomy in 1985 after a work related injury. He is disabled from working as a firefighter.
Dr. Robert Steiner examined Rapp on November 8, 1991. He diagnosed degenerative arthritis involving the medial compartment of the right knee following an open medial meniscectomy performed in 1983. Rapp was restricted from activities which require prolonged standing, prolonged walking, running or jumping. Rapp is capable of "lighter duty work status" in Dr. Steiner's opinion.
The record reveals the following:
The only information about Rapp's injury and accident contained in his affidavit is the date of his accident, 7/03/90 and the following statement:
While fighting a fire at Pontchartrain Beach, I slipped on stairs injuring both knees, causing pain for which I sought medical treatment from Dr. Kitziger.
Rapp's injury report is consistent with his affidavit. Dr. Kitziger's report dated October 8, 1991 supports the allegation that Rapp is unable to work as a firefighter. There is a letter in the record from a rehabilitation counselor, J. Fred Crane, Jr. to Dr. Kitziger dated December 3, 1991 that states:
Please allow me to confirm my understanding of Mr. Rapp's present work restrictions at this time. As a result of this knee injury, you have advised that Mr. Rapp should avoid any squatting or kneeling activities and should avoid any lifting above 25 pounds. With regards to his return to work efforts, you have further indicated that Mr. Rapp would be able to stand for 4 or 5 hour total in a day as long as he is allowed some alternating sitting as needed. Mr. Rapp would be able to climb stairs on an occasional basis. In general, you have advised that Mr. Rapp avoid any activities that would put any stress on his lower extremities.
In a report dated November 8, 1991, Dr. Robert A. Steiner states that:
Based upon his examination, review of his x-rays, and his MRI report, I would advise him to refrain from activities which require prolonged standing, prolonged walking, running, or jumping. He is suitable for lighter duty work status. [Emphasis added.]
However, there is nothing in the record concerning Rapp's educational and training background or non-firefighting job potential. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. Rapp failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Rapp on motion for summary judgment.
19. Charles E. SandersSanders' motion for summary judgment alleges the following:
Dr. Ruel saw Sanders on April 28, 1989. Sanders incurred an injury after lifting an electric generator when he felt pain in his right elbow. Dr. Ruel diagnosed a strain to the elbow or traumatic lateral epicondylitis, i.e., inflammation to the tendon that attaches to the outer side of the elbow as a result of an injury. Sanders returned to work on July 9, 1989. Sanders reinjured his elbow at work on August 26, 1989. Dr. Ruel stated Sanders could no longer perform firefighting duties as of December 21, 1989. Dr. Ruel prohibited Sanders from lifting over 15-20 pounds, pushing, pulling, chopping, and carrying or use of the arm in a repetitive movement.
The only information about Sander's injury and accident contained in his affidavit is the date of his accident, 08/26/89, and the following statement:
While using a pike pole making forcible entry into rear of fire structure at 4100 Mandeville, heavy wood fell on me striking my right elbow and arm, causing pain for which I sought medical treatment from Dr. Ruel.
Dr. Ruel's work limitations were expressed only in terms of firefighting:
As a result of the injury to the elbow, this man cannot perform the work that a fireman does, and that is lift things, push, pull, chop, carry, use the arm in a repetitive movement in order to function as a firefighter.
Sanders's injury report is consistent with his affidavit. Dr. Ruel's deposition is consistent *455 with the allegations made in Sanders's motion for summary judgment. However, there is nothing in the record concerning Sanders's educational and training background or non-firefighting job potential. No one expressed any opinion about his ability to perform any other type of job. Schmitt v. City of New Orleans, supra, and Smith v. Hamp Enterprises, Inc., supra. Sander's failed to establish a prima facie case that he is disabled from employment earning at least 90% of his firefighting income. That issue remains as a genuine issue of material fact. Therefore, it was error for the hearing officer to find for Sanders on motion for summary judgment.
20. Leslie J. SaurageSaurage's motion for summary judgment alleges the following:
Saurage has been treated by Dr. James Smith since May 16, 1990. Dr. Smith diagnosed Saurage as having dilated cardiomyopathy, hyperlipidemia, and left bundle branch block. In his report dated May 29, 1991, Dr. Smith classified Saurage as completely disabled.
The only information about Saurage's injury and accident contained in his affidavit is the date of his accident, 5/01/90 and the following statement:
While operating fire pumper at a fire at South Claiborne and Toledano, I experienced chest pains. I sought medical treatment from Dr. Smith.
Saurage's injury report is consistent with his affidavit.
Saurage fractured his left great toe while mowing the lawn on May 5, 1990. He had some minor surgery in connection with this injury at which time Dr. Hontas noted:
Post-operatively a cardiac consult was made because of some changes in the EKG.... He is to follow-up with the Cardiologist in an out-patient basis.
Dr. Smith's medical records are consistent with the allegations made by Saurage in his motion for summary judgment. In his "Progress Note" dated May 29, 1991 Dr. Smith noted that:
Mr. Saurage has dilated cardiomyopathy. He is completely disabled. [Emphasis added.]
As a twenty-year veteran of the Fire Department, he is entitled to the presumption of causation under LSA-R.S. 33:2581.
Dr. Smith consistently noted the continued existence of Saurage's cardiopathic condition in all "Progress Notes" subsequent to the May 29, 1991 finding of total disability, including the most recent one dated 10/15/93. Therefore, in the absence of any countervailing affidavits or depositions or other showing on the record of this motion for summary judgment, the City has failed to rebut Saurage's claim of disability. Therefore, it was not error for the hearing officer to grant Saurage's summary judgment for Supplemental Earnings Benefits.

THE CONSOLIDATION OF THESE CLAIMS WAS NOT ERROR
The hearing officer consolidated these claims because he felt that the question of the applicability of the Cousins decision to the City's claim to the right of offset provided a common question of law that transcended all other issues presented by the cases. We also note that there is one common defendant and common representation on both sides.
LSA-C.C.P. art. 1561 provides that "two or more separate suits involving a common issue of law or fact pending in the same court" may be consolidated. We find no instance in the jurisprudence allowing consolidation where the facts of each case were as separate and distinct as they are here. However, there are no cases holding that such a consolidation would be error. As there are some common questions of fact and law as called for in the broad language of LSA-C.C.P. art. 1561, we cannot say that he hearing officer abused his broad discretion in consolidating these cases.

PRESCRIPTION DOES NOT BEGIN TO RUN WHEN BENEFITS WERE SUBJECTED TO THE LSA-R.S. 23:1225 OFFSET
LSA-R.S. 23:1209 provides that an action for SEB be commenced within three years from the date benefits were last paid. The City argues that this three year period should be applied to what are, in effect the claims for improper offset urged by the *456 plaintiffs in these proceedings. The plaintiffs counter that the LSA-R.S. 23:1209 three year prescriptive period only applies to a termination of benefits and not to an offset. Plaintiffs further argue that in the event it is determined by this Court that the three year limitation applies to offsets as well as terminations, then the offsets in this case should be treated as periodic events each time a payment is made in the nature of continuing torts, continually interrupting prescription.
Offsets can be distinguished from terminations. A termination of benefits ordinarily would indicate that the employer had made the determination that the employee had no right of recovery, or that the employer refused to pay benefits regardless of that right. On the other hand, implicit in the offset is an acknowledgement that benefits are in fact due the employee, but the employer is entitled to credit for payments the employee receives from certain statutorily designated collateral sources. Therefore, the exercise of the right of offset is a tacit acknowledgement of an entitlement to benefits that continues as long as the offset continues. We find that this continuing acknowledgement is sufficient to interrupt prescription on the employee's underlying claim for benefits as long as the offset persists. However, this is not a finding that the City may not have acquired through prescription the right to retain the benefit of previously credited offsets. We make no ruling on that issue at this time as it is not properly before this Court.
Following this same reasoning, plaintiffs contend that the prescription of medical benefits is interrupted when indemnity benefits are paid, citing Levatino v. Domengeaux and Wright, P.L.C., 593 So.2d 721, 724 (La.App. 1 Cir.1991) writ denied, 596 So.2d 196 (La. 1992) and Ancelet v. Moreno's Air Conditioning, Inc., 331 So.2d 127, 129-130 (La.App. 3 Cir.1976). Plaintiffs' argument appears to be that the offsets were the equivalent of indemnity benefits. Therefore, according to the plaintiffs' reasoning the offsets interrupted the prescription on the medical benefits.
LSA-R.S. 23:1209C provides in pertinent part:
Where [medical payments] have been made in any case, this limitation shall not take effect until the expiration of three years from the time of making the last payment of medical benefits. [Emphasis added.]
This specific reference to "the last payment of medical benefits" means exactly what it says. It does not say "the last payment of indemnity benefits" or even the more general and, therefore, arguably vague "the last payment of benefits." We cannot say that LSA-R.S. 23:1209C is ambiguous and, in the guise of statutory construction, rewrite it to say more than it says.
The 1976 decision in Ancelet, supra, antedates the enactment of LSA-R.S. 23:1209C as explained by Levatino, supra:
Prior to the 1986 amendment La.R.S. 23:1209 provided that all claims for payments were barred by failure to file a claim within one year of the accident or one year from "the last payment". Since payments were not distinguished the courts applied the same one year period to claims for compensation and medical expenses.
Therefore, Ancelet has no bearing on the instant case because the 1986 amendment to LSA-R.S. 23:1209 distinguishes claims for compensation from claims for medical expenses which was not the case when Ancelet was decided.
Levatino deals only with the one year prescriptive period in the first sentence of LSA-R.S. 23:1209C referring to "payments made under this Chapter." Levatino relied on the fact that the phrase just quoted was not specifically limited to medical payments to reach the conclusion that the payment of indemnity benefits can interrupt the prescription for the payment of medical benefits. This, in spite of the fact that the sentence in which that phrase is found commences: "All claims for medical benefits ..." Levatino fails to quote or even note the three year prescriptive period and the specific reference in the next sentence of LSA-R.S. 23:1209C to "the expiration of three years from the last payment of medical benefits."
Levatino, 593 So.2d at 724 argues public policy:

*457 There are sound reasons to allow weekly benefits to interrupt a claim for medical expenses. It is grossly unfair for a claimant, such as the one in this case, to be disabled from a job-related injury and drawing weekly benefits for that disability, and yet be denied medical benefits for the disabling injury. Further, a disabled employee drawing weekly benefits would be encouraged to incur unnecessary medical expense for the sole purpose of keeping the claim viable.
But Levatino involved a one-year prescriptive period. The accident in Levatino occurred in April of 1987, the Worker's Compensation claim was filed in December of 1988, and suit was filed in April of 1989, a two year period. The three year prescriptive period expiring three years "from the last payment of medical benefits" found in the second sentence of 23:1209C was not considered by the Levatino court.
Therefore, neither the law nor the policy arguments made by Levatino apply to the instant case where we are dealing with a three year prescriptive period. Levatino conjures up images of workers incurring frequent unnecessary medical expenses in order to prevent the tolling of a relatively short one-year prescriptive period. That concern becomes much less compelling when we are faced with a three year prescriptive period after "making the last payment of medical benefits."[5] Where a worker goes for more than three years without any medical attention the legislature could have been motivated by a concern that expenses arising after such a long hiatus might not be legitimately connected with the previous injury.
The invocation of public policy by the courts is not appropriate in those areas where the legislature has expressed its will. In a representative democracy acts of the legislature are the embodiment of public policy.
Therefore, for factual, legal, and policy reasons this Court declines to follow Levatino where the three year prescriptive period is involved.
The plaintiffs point out that the City filed no formal exception of prescription in the trial court, and that an exception of prescription presented only in argument either orally or in writing by way of memorandum or brief is not contemplated by the Code of Civil Procedure. LaBove v. Resource Transp. Co., 625 So.2d 583, 587 (La.App. 3 Cir.1993); Hyde v. Hibernia Nat. Bank in Jefferson Parish, 584 So.2d 1181, 1184 (La. App. 5 Cir.1991). Regardless, the hearing officer ruled:
On the exception of prescription it is denied because the period of prescription should not have run while an offset was being taken because an offset is not the same as a termination.
* * * *
Also, during that period the claimants were 13 consecutive weeks entitled to SEB during the period of the offset, if the offset is in fact a termination which I don't believe it is. That, in effect, interrupts the prescriptive period run.
LSA-C.C.P. art. 924 provides:
All exceptions shall comply with Articles 853, 854, and 863, and whenever applicable, with Articles 855 through 861. They shall set forth the name and surname of the exceptor, shall state with particularity the objections urged and the grounds thereof, and shall contain a prayer for the relief sought.
A reading of Articles 853, 854, and 863 indicates that a written exception is required. Settoon Marine, Inc. v. Great Lakes Dredge & Dock, Co., 95-0046, p. 8 (La.App. 4 Cir. 1995); 657 So.2d 537, 541, does not support the City's position because of the unique facts involved:
While we agree that a Motion for Involuntary Dismissal is generally not the proper procedural mechanism to plead prescription, the procedural history of this case suggests there was no error in its use. On April 13 1994, Great Lakes filed a "Motion for Partial Summary Judgment" wherein it *458 argued prescription as the basis for its motion. The court referred the matter to the merits. At the close of trial, counsel for Great Lakes and Settoon again argued the issue of prescription, albeit in the procedural form of a Motion for Involuntary Dismissal.
Thus, in view of the fact that the issue of prescription was before the trial court and was argued by both parties, we find no error in granting the involuntary dismissal on those grounds.
Settoon does not conflict with LSA-C.C.P. art. 854 which states: "No technical forms of pleading are required." In Settoon the plea of prescription was incorporated in a formal written motion. It was not made orally or by way of brief or memorandum. Settoon represents the extreme outer limit to which this Court has gone in dispensing with the technical requirements for an exception of prescription. The facts of the instant case do not support a further extension of those limits. Therefore, although the hearing officer purportedly ruled below on the City's exceptions of prescription, those exceptions were not properly before the hearing officer.
However, the City filed an exception of prescription in this Court in opposition to the claims for additional medical benefits of Ronald C. Barre, and the claim of Robert J. Comeaux for additional indemnity benefits.
An exception of prescription may be considered for the first time in the appellate court pursuant to LSA-C.C.P. art. 2163:
The appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to a submission of the case for a decision, and if proof of the ground of the exception appears of record.
If the ground for the peremptory exception pleaded in the appellate court is prescription, the plaintiff may demand that the case be remanded to the trial court for trial of the exception.
We remand these exceptions to the hearing officer for disposition in accordance with this opinion.

DUPRE MAKES THE EFFECT OF COUSINS RETROACTIVE
The City claims the right to offset the disability benefits plaintiffs receive against their compensation benefits. LSA-R.S. 23:1225C(1)(c).
In Cousins v. City of New Orleans, 608 So.2d 978 (La.1992), the Louisiana Supreme Court held that the indemnity benefit set-off to which an employer is entitled under LSA-R.S. 23:1225C(1)(c) is not available when the employee, despite receiving the very disability benefits described in that statute, is vested in and could alternatively receive equal payment amounts through a tenure-based retirement benefit plan. Plaintiffs contend that their retirement entitlements bring them within the scope of Cousins thereby depriving the City of the right of offset provided by LSA-R.S. 23:1225(1)(c). The City concedes that with the exception of Johnson, Juneau, and Kerner the plaintiffs fit the Cousins profile. However, the plaintiffs claims arose before Cousins was decided. The City entreats this Court not to give retroactive effect to Cousins. But this Court has ruled that Cousins is retroactive in its effect. Dupre v. City of New Orleans Through New Orleans Fire Dept., 94-1185 (La.App. 4 Cir 12/28/94); 648 So.2d 503, 508. We are not persuaded that Dupre should be overruled.

THE APPLICABILITY OF COUSINS TO THE CLAIMS OF WILLIE JOHNSON, MERRILL JUNEAU, AND WILLIAM KERNER.
The City asserts that it is entitled to the benefit of the LSA-R.S. 23:1225C(1)(c) offset against plaintiffs Johnson, Juneau, and Kerner regardless of the retroactive applicability of Cousins. The hearing officer agreed to allow the offset as to Juneau, but not as to the other two plaintiffs.
In brief the plaintiffs argue that the offset should be disallowed as to all three, including Juneau.[6] The plaintiffs are *459 precluded from appealing the hearing officer's ruling against Juneau as they did not file an appeal and failed to raise the issue in their answer to the City's appeal. The plaintiffs' answer to the appeal asked only that "in addition to the relief afforded by trial court, attorney's fees, penalties, interest and costs be assessed against the City of New Orleans for this appeal." An answer to an appeal only operates as an appeal from those portions of the judgment of which the answer complains. LSAC.C.P. art. 2133; Story v. Martin, 217 So.2d 758 (La.App. 4 Cir.1969). Where the answer fails to specify the complaints urged by the appellee, they may not be considered on appeal. McTurner v. McTurner, 26-123, p. 7 (La.App. 2 Cir. 9/21/94), 649 So.2d 1, 5, writ denied, 94-2876 (La.1/27/95), 650 So.2d 241.
The merits of the City's claim to the right of offset against Johnson and Kerner requires a thorough analysis of Cousins and a careful comparison of the facts of that case with those of Johnson and Kerner.
The operative language in Cousins, 608 So.2d at 980 and 981, is:
A trustee of the Fund testified that plaintiff would have received the same amount of benefits whether he retired under the disability plan or the retirement plan. According to the officer, plaintiff chose the disability pension because a portion of the benefits are exempt from income taxation. For his part, plaintiff verified that he had taken a disability pension. The court of appeal, in effect, held that plaintiff was stuck with the choice he had voluntarily made.
At the time of his disabling injury plaintiff's right to retirement benefits had become fully vested. He could have taken early retirement then without prejudice to his right to receive the full amount of worker's compensation benefits payable because of his disability. He also, according to the trustee, could have transferred at any time from the old (pre-1986) system into the post-1986 actuararily funded system.
There is no compelling reason for holding that plaintiff forever forfeited his vested right to receive retirement benefits when he elected to take the equal amount of disability benefits. Plaintiff's technical election between pension plans did not have any binding effect on the rights of any party. Both plans were part of the same statutory scheme for firefighters and were funded from the same pool. There would have been no detriment to the Fund if plaintiff had transferred from receiving disability benefits to receiving the retirement benefits to which he was equally entitled, as long as he did not receive both at the same time.
The Section 1225 C credit constitutes a restriction on an injured employee's right to worker's compensation benefits and must be strictly construed. Inasmuch as Section 1225 C is inapplicable to an employee who retires under a tenure-based retirement plan, we construe Section 1225 C as inapplicable to a disabled employee who is eligible for retirement with the same amount of benefits under both the disability benefit plan and the tenurebased retirement plan, especially when the latter controls the amount of benefits payable. [Emphasis added.]
Cousins, 608 So.2d at 981, footnote 6, citing McKenzie v. City of Bossier City, 585 So.2d 1229 (La.App. 2 Cir.1991) and Domingue v. Hartford Insurance Co., 568 So.2d 221 (La.App. 3 Cir.1990) states that: "This construction accords with that of intermediate courts of other circuits."
In McKenzie the court held that the City was not entitled to a credit against its worker's compensation obligation for plaintiff's medical retirement benefits paid under the City's plan, when he was eligible for early retirement with the same amount of benefit. Domingue, 568 So.2d at 225, is important because the court refused to allow the offset in spite of the fact that the disability retirement benefits and the tenure-based retirement benefits were not exactly equal:
An examination of the retirement plan for employees of Lafayette General Hospital shows that Ms. Domingue, who had been an employee of the hospital since 1947, had fully vested rights and could have taken an early retirement at the time of her injury, and that her normal retirement date was May 1, 1990 (when she reached 65). Her monthly disability retirement benefits *460 were calculated on the same employee data that was used for the calculation of her early retirement benefits. Although the disability benefit (until May 1, 1990) would be somewhat higher than the early retirement benefit, the total remained essentially a retirement benefit based on number of years of service. La.R.S. 23:1225 nowhere provides for a reduction of benefits paid under the provisions of the worker's compensation statute for retirement benefits. [Emphasis added.]
At the time Johnson left the system he had between 22 and 23 years of service and was vested in his pension. He was born on June 2, 1944 and was not eligible for retirement until he reached age fifty in 1994. He was injured and last worked on April 8, 1986. He went on disability retirement on September 30, 1990 when he was only 46 years old. If he had waited until he reached age fifty to claim his benefits, the service connected pension and the disability pension would have been the same. The City contends that Johnson got an extra four years of benefits by retiring early on disability. The hearing officer found that although he started receiving benefits because of disability four years sooner than he would have had he waited until he was eligible for a non-disability retirement, he received no "extra" benefits because what he received was the actuarial equivalent of what he would have received had he waited until he was age fifty. The hearing officer believed that the equivalency of benefits "under both the service and disability pensions was a key factor in Cousins " and that the actuarial equivalency in Johnson's case was sufficient to satisfy Cousins.
We agree with the hearing officer. Domingue shows that the individual disability payments do not always have to equal the exact dollar amount of the corresponding retirement benefit where "the total remained essentially a retirement benefit based on number of years of service." Id., 568 So.2d at 225. Because Johnson's disability benefit is the actuarial equivalent of his retirement benefit, in an economic sense the two are more equal than the disability and retirement benefits in Domingue. Moreover, as Johnson's disability pension is calculated as the actuarial equivalent of his retirement benefit, by definition it remains as required by Domingue, "essentially a retirement benefit based on years of service." We find that where the essence of the disability benefit is retirement in nature, and economic equivalency exists, these factors outweigh Johnson's ineligibility for immediate retirement. The City is entitled to no offset as to Johnson.
On the other hand, William Kerner's disability benefit was 66 2/3% of his salary as a disability benefit, rather than the 64% benefit he would have gotten had he taken a service connected retirement. Kerner's disability benefit was calculated as a percentage of his pre-injury compensation (2/3) unrelated to any retirement benefit based on years of service. Although Kerner's disability benefit does not appear to be significantly larger than his retirement benefit would have been, we do not believe that Domingue can be stretched to cover a disability benefit that is not equal to the retirement benefit on a per payment basis, nor the economic equivalent on an actuarial basis, and is not calculated using the same standards as the retirement benefit, in this case, years of service. Therefore, it was error for the hearing officer to deny the City the right of offset as to Kerner.

THE RECORD DOES NOT YET SUPPORT THE AWARD OF PENALTIES FOR THE ARBITRARY AND CAPRICIOUS ACTS OF THE CITY
The hearing officer ruled that the City's failure to implement the Cousins decision on a retroactive basis was arbitrary and capricious, warranting an award of attorney's fees and penalties. LSA-R.S. 23:1201.2. At the time the hearing officer rendered the decision and reasons for judgment that are the subject of this appeal, this Court had not yet rendered its decision in Dupre v. City of New Orleans, 94-1185 (La.App. 4 Cir. 12/28/94); 648 So.2d 503, declaring that Cousins should be applied retroactively. Dupre held that the failure of the City to recognize the retroactive nature of Cousins was neither arbitrary nor capricious:
Because a legitimate question existed as to the retroactivity of the Cousins decision, *461 the City was not arbitrary or capricious in waiting for this issue to be resolved before reinstating full worker's compensation payments without offset to these plaintiffs.
Dupre, p. 7, 648 So.2d at 508.
As the City had no definitive notice of the holding of Dupre prior to the hearing officer's actions in this case, the City is no more arbitrary nor capricious in this case than it was in Dupre when the City failed to recognize the retroactive application of Cousins.
Where Johnson is concerned, the City was neither arbitrary nor capricious in implementing the offset because the applicability of Cousins is not immediately obvious. Johnson's facts are sufficiently distinguishable from Cousins to force us to conclude that although we disagree with the City's argument that Cousins does not apply, we cannot say that the City's argument was either unreasonable or without foundation.
The hearing officer found that the City's "failure to pay medical bills relating to claimants' work-related injuries" was arbitrary and capricious. The City argues that plaintiffs' evidence is not competent and that even if it were it does not prove that the City terminated medical benefits as opposed to merely being delinquent in its payments.[7] In support of the proposition that the City terminated medical benefits generally, the plaintiffs rely on two exhibits: A letter to Dr. Robert E. Ruel from the New Orleans Rosenbush Claims Service, Inc. dated November 23, 1993 and a letter dated November 30, 1993 to "Dear Patient" from Dr. Ruel. The letter to Dr. Ruel from Rosenbush does not state that the payment of medical benefits has been terminated by the City. Rosenbush states only that "our office will no longer be able to authorize treatment, or guarantee payment" as that "function has been taken over by Deputy City Attorney Milton Osborne, Jr."
The letter from Dr. Ruel to "Dear Patient" does not state that medical benefits have been terminated by the City. That letter states that Dr. Ruel was "routinely unable to contact [Deputy City Attorney Milton Osborne, Jr.] for authorization and when he is able to be contacted, his response to our requests have been vague and unclear." Dr. Ruel goes on to state that he is "not certain the city's compensation program will cover services rendered to you as no one was available to give proper authorization." Dr. Ruel reassures the "Dear Patient" that "we will continue treatment" regardless.
There is nothing in the record from which it can be determined who "Dear Patient" is. Dr. Ruel does not refer to the letter in any of his numerous depositions and there is no reference to it in any of the affidavits.
These two letters are insufficient to shift the burden to the City to disprove that it terminated medical benefits to the plaintiffs generally. The failure of the plaintiffs to make out a prima facie case on this issue relieves the City of the necessity of introducing countervailing affidavits, depositions, etc.
There was evidence that there were some unpaid medical bills outstanding for five of the plaintiffs.
Dr. Ruli was deposed on December 8, 1993. The statement attached to his deposition concerning Drouant shows what appears to be an unpaid balance of only $35.00 which was incurred in the previous month. This statement creates no inference of delinquency, much less an inference of a termination of benefits.
Dr. George Murphy's statement annexed to his deposition taken on January 7, 1994 concerning Consentino shows an outstanding balance as of November 15, 1993 of only $100.00. This statement is insufficient to create an inference of a termination of benefits.
Annexed to Dr. Echenique's deposition of Cordes on January 5, 1994 is a statement of the Cardiovascular Institute showing a balance due of only $35.00. This statement is insufficient to create an inference of a termination of benefits. There is also a statement of the Cardiology Institute showing a balance due of $70.00. Typed on the statement are the words: "City Attorney has file; can't process." This is somewhat more persuasive, *462 but without further explanation is still insufficient.
The statement of Orthopaedics & Sports Medicine dated November 17, 1993 annexed to Dr. Ruel's deposition concerning Ruel dated November 18, 1993 shows a sixty day balance of $120.00. This is insufficient to create an inference of a termination of benefits without further support.
The statement of Orthopedic Surgery Associates dated December 8, 1993, annexed to the deposition of Dr. Courtney Russo dated December 9, 1993 shows a balance due of only $126.00, half of which was incurred less than two weeks previously. The other $63.00 was in sixty day status. This is insufficient to create an inference of termination of benefits without further support.
The record contains no other properly verified evidence on this issue, i.e., annexed to affidavits, etc. which can be considered by this Court. Kennington v. Blume, 94-0744 (La.7/1/94); 638 So.2d 1066; and Jackson v. Belleau, 94-1469 (La.App. 3 Cir. 6/7/95); 657 So.2d 478. Bridges v. Quality Inn Midtown, 626 So.2d 732, 734 (La.App. 4 Cir.1993) is relied upon by plaintiffs for the proposition that unverified evidence may support a motion for summary judgment. However, Bridges was based on an exception found in LSA-R.S. 23:1122 to the general rule that would reject such evidence on summary judgment as incompetent. As such Bridges should be strictly construed and limited to only what is explicitly provided by LSA-R.S. 23:1122. LSA-R.S. 23:1122 provides that the "physician's invoice or receipt shall be prima facie proof of the cost." LSA-R.S. 23:1122 does not provide that a physician's invoice shall be prima facie proof that it is unpaid or that benefits have been terminated. LSA-R.S. 23:1122 relates to worker's compensation medical examinations and the costs incurred in connection with them. Under Bridges an unverified medical report not objected to within the six day period provided by LSA-R.S. 23:1122 "shall be prima facie evidence of the facts therein stated..." LSA-R.S. 23:1122 is limited to evidence of the worker's medical condition found in medical reports and the cost of such reports. LSA-R.S. 23:1122 and Bridges do not affect the rules of evidence for any other category of documents, nor were they intended to confer any special evidentiary status on the reports of medical examinations and billings in regard to non-medical questions such as whether benefits have been terminated.
Where the record contains so few instances of unpaid medical bills, and then only for small amounts that are not severely delinquent, the only inference to be drawn, if any, is one favorable to the City that the medical benefits were not terminated. As the record does not support a summary judgment finding that medical payments have been terminated, per force it will not support a finding that the City was either arbitrary or capricious in terminating those benefits.
Nothing in this opinion should be construed as preventing the plaintiffs from proving with competent evidence on remand that one or more of the City's actions involving any number of these plaintiffs was arbitrary and capricious.
Contrary to the other plaintiffs, James L. Milano and Leslie J. Saurage proved a prima facie case. The City offered no evidence to rebut them. The only inference that can be drawn from the record under such circumstances is that the City had no basis in fact to deny the benefits due. Therefore, we find no error in the hearing officer's award of attorneys' fees to these two claimants.

DECREE
For the foregoing reasons the judgment of the hearing officer is affirmed only as to plaintiffs James L. Milano and Leslie J. Saurage together with attorney's fees of $7,500[8] in connection with each of these plaintiffs which includes work done before the hearing officer and before this Court; a penalty of 12% on all past due benefits; legal interest from judicial demand; and all costs of these proceedings allocable to these two plaintiffs as determined by the hearing officer on remand.
*463 The judgment as to all other plaintiffs is reversed and remanded for further proceedings consistent with this judgment.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED

ON REHEARING

November 12, 1996.
PER CURIAM.
Plaintiff-Appellee, Robert Cordes, filed a motion for clarification which we hereby treat as a timely application for rehearing. No opposition has been filed.
The September 18, 1996 opinion of this Court finds no error in the hearing officer's award of summary judgment in favor of Cordes, but through inadvertence the decree fails to affirm that judgment.
Therefore, the original decree of this Court rendered on September 18, 1996 is amended to clarify that we affirm the judgment of the hearing officer in favor of Robert Cordes together with attorney's fees, penalties, legal interest, and all costs, all on the same basis as similarly awarded to plaintiffs Milano and Saurage in the original opinion.
The application for rehearing of the City of New Orleans is denied.
NOTES
[1] As the specific dollar amounts of each item of recovery awarded to each plaintiff has not been made an issue in this appeal, reference to each such amount has been omitted in the interest of brevity.
[2] The Supreme Court in Smith made clear exactly what this burden of proof is by way of example:

It was stipulated by the parties that plaintiff's average monthly wage was $1334.72. [Footnote omitted.] Therefore, in order to be entitled to supplemental earnings benefits, plaintiff had to prove by a preponderance of the evidence that he was unable to earn $1,201.25 a month, 90% of his average monthly pre-injury wage. [Emphasis added.] The trial court should take into account all those factors which might bear on an employee's ability to earn a wage.
Id. See also Smith v. Hamp Enterprises, Inc., 95-2343, p. 3 (La.App. 4 Cir. 4/17/96); 673 So.2d 267.
[3] It is interesting to note that the same Robert C. Schmidt who was the plaintiff in the Schmitt case decided previously by this Court, was also one of the original plaintiffs in these consolidated cases.
[4] LSA-R.S. 33:2581 provides that:

Any disease or infirmity of the heart or lungs which develops during a period of employment in the classified fire service in the state of Louisiana shall be classified as a disease or infirmity connected with employment .... whenever the same is manifested at any time after the first five years of employment.
[5] This should not be interpreted as an indication that this Court would necessarily follow the First Circuit if presented with Levatino facts and a one year prescriptive question.
[6] Plaintiffs in their brief argue that no offset should be allowed against Cordes. This raises no issue because it is consistent with the judgment of the hearing officer and the City does not contend otherwise. The City contends that the offset was proper only in regard to Juneau, Johnson and Kerner.
[7] The City's brief does not deny that benefits were terminated. It merely states that the plaintiffs failed to prove by competent evidence that benefits were terminated.
[8] The hearing officer awarded $100,000.00 in globo for all plaintiffs. We assume that he had in mind $5,000.00 per plaintiff. This is not unreasonable. We conclude that an additional $2,500.00 for each plaintiff on appeal is reasonable.