707 So.2d 1315 (1998)
Emily BOUTTE, Plaintiff-Appellant,
v.
LANGSTON COMPANIES, INC., Defendant-Appellee.
No. 97-972.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1998.
Rehearing Denied March 17, 1998.
*1316 Michael Benny Miller, Crowley, for Emily Boutte.
Dennis Ray Stevens, New Iberia, for Langston Companies, Inc.
Before DOUCET, C.J., and PETERS and SULLIVAN, JJ.
SULLIVAN, Judge.
Emily Boutte appeals a judgment of the Office of Workers' Compensation (OWCA) denying her claim for disability benefits, medical expenses, penalties, and attorney fees. For the following reasons, we affirm.

Facts
Boutte was employed as a seamstress, or "strap attacher," for Langston Companies (Langston), at its plant in Crowley, Louisiana. She injured her neck and back on November 20, 1995 when she slipped, struck her head on a metal post, and fell to the concrete floor while walking to her work station. At the time of her injury, Boutte was forty-seven years old and had been employed with Langston for eleven months.
Langston and its workers' compensation insurer, Travelers Insurance Company (Travelers), referred her first to Dr. Mark Dawson, a family practitioner, then to Dr. Clifton Shepherd, an orthopedic surgeon. Dr. Shepherd released Boutte to light duty employment in December of 1995. In January of 1996, Boutte returned to work on light *1317 duty status, but she quit after three days, claiming that pain prevented her from working.
Boutte then began treatment with Dr. Michel Heard, also an orthopedic surgeon. After ordering several diagnostic studies, Dr. Heard considered Boutte to be totally disabled and recommended further testing with Dr. James Domingue, a neurologist. Travelers refused to authorize the referral to Dr. Domingue and did not pay Boutte compensation benefits, contending that she presented insufficient evidence of disability.
On January 10, 1996, Boutte filed this disputed claim for compensation against Langston and Travelers. After trial on August 17, 1997, the workers' compensation judge found that Boutte failed to prove a disability entitling her to either temporary total disability benefits or supplemental earnings benefits. The workers' compensation judge also rejected Boutte's claims for (1) penalties and attorney fees under La.R.S. 23:1201(F) and 23:1201.2 and (2) damages and attorney fees under La.R.S. 23:1127 for Travelers' alleged release of her medical records to a self-employed vocational rehabilitation counselor. On appeal, Boutte argues six assignments of error.

Disability Benefits and Medical Expenses

(Assignments of Error Nos. 2, 3, and 4)
Boutte urges that we find manifest error in the workers' compensation judge's finding that she is not disabled and in the failure to order defendants to pay for the recommended testing with Dr. Domingue. She also contends that the record does not support the finding that "Dr. Shepherd found no objective reason why claimant could not return to work." These assignments are interrelated because they require a discussion of the same medical evidence and lay testimony.
Langston's plant manager, Glenn Johnson, referred Boutte to Dr. Dawson on the day of the accident. Dr. Dawson prescribed muscle relaxers and pain medication and ordered cervical X-rays, which revealed a congenital cervical fusion at C3-4. He also prescribed three weeks of physical therapy during which time Boutte was not to work. When Boutte did not improve, Travelers referred her to Dr. Shepherd.
At his initial examination on December 11, 1995, Dr. Shepherd noted apparent tenderness in the left posterior cervical muscles, the left trapezius muscle, and the mid-thoracic region. Otherwise, he observed full range of motion with no atrophy or effusion in the neck, back, wrists, and shoulders. Impingement tests were negative for the shoulders. He reported that X-rays of the cervical spine showed mild arthritic changes, but he did not comment about the congenital cervical fusion that appeared on Dr. Dawson's films. His diagnosis was a mild cervical and lumbar strain with no evidence of serious injury. Although Dr. Shepherd continued the medications and physical therapy prescribed by Dr. Dawson, he released Boutte to light duty activities.
When Dr. Shepherd examined Boutte again on December 19, 1995, he again noted apparent tenderness in the right and left cervical muscles and in the lower half of the lumbar muscles. However, he also reported inconsistencies in the lumbar examination and that "[h]er complaints are excessive when compared to her benign examination." He again recommended continuing medication and therapy. After an examination on January 2, 1996, Dr. Shepherd stated that his opinion remained unchanged despite Boutte's continued complaints, but he recommended an MRI of the neck and back.
On January 15, 1996, Boutte attempted to perform light duty work at Langston. Johnson, the plant manager, explained that Boutte's new job was similar to her former one except that the "attacher" now positioned each strap only once on the sewing machine, as opposed to five times. The machine had been reprogrammed for a long, parallel sew, making the attaching of the straps faster and easier. Johnson also explained that employees on light duty did not have to meet a production quota, would still receive production bonuses based upon their unit's overall performance, and were free to move about as their condition required. Boutte quit this position after three days, informing Johnson that even with these changes she could not perform the job.
Boutte began treatment with Dr. Heard on January 22, 1996. As did Dr. Shepherd, Dr.
*1318 Heard noted tenderness in the neck and back, with no spasm and no abnormalities consistent with a neurological deficit. X-rays revealed the congenital fusion seen on Dr. Dawson's films, as well as mild spondylosis at C4-5 and degenerative changes in the lumbar spine that were normal for Boutte's age.
Dr. Heard then ordered further diagnostic testing that revealed additional abnormalities in the cervical spine. A CT scan of January 30, 1996 showed prominent osteophyte formation at three levels and narrowing of the spinal canal and the neural foramina at two levels. An MRI of February 14, 1996 noted that the osteophytic spurring caused anterior compression of the thecal sac at two levels. A myelogram performed on June 5, 1996 noted an underfilling of the nerve root sleeves at three levels, and the post-myelography CT scan noted a small, central disc herniation at C6-7. The lumbar scans and myelogram were all within normal limits.
In explaining the significance of these findings, Dr. Heard testified that the stenosis could result in a prolonged recovery and that the underfilling of the nerve root sleeves suggested, but did not prove, some nerve impingement. He acknowledged that no test revealed actual pinching of the nerves, that the small herniation at C6-7 was not pushing on a nerve, and that the myelogram showed no real evidence of foraminal encroachment. He believed that Boutte could one day return to light duty, but that she was still disabled from pain brought on by the soft tissue injury, spondylosis, the congenital defect, and the small herniation. He recommended continued treatment with medications, cortisone injections, and physical therapy, as well as the diagnostic work-up with Dr. Domingue.
At defendants' request, Dr. Shepherd examined Boutte again on August 28, 1996. On that date, Boutte complained of neck pain with bilateral hand numbness and tingling and lower back pain that radiated to the legs. Dr. Shepherd reported that Boutte moved slowly and that she exhibited poor effort when testing upper extremity strength. In the cervical and lumbar exams, he found full range of motion, normal reflexes, and no definite tenderness or spasm. After reviewing the diagnostic testing, Dr. Shepherd noted the arthritic changes, but did not comment about the other findings, such as the spinal and foraminal stenosis and the small, central herniation. He stated that Boutte "has had plenty of time to reach maximum medical improvement," and he recommended termination of all treatment and testing. He believed her capable of "regular activities," including those outlined in a job description provided to him.

a. Temporary total disability.
An employee is entitled to temporary total disability benefits only upon proof by clear and convincing evidence, unaided by any presumption of disability, that he is physically unable to engage in any employment or self-employment, including but not limited to employment while working in pain. La.R.S. 23:1221(1)(c).
The issue of disability is a factual determination that the workers' compensation judge makes only after weighing both the medical and lay testimony in the record. Fritz v. Home Furniture-Lafayette, 95-1705 (La.App. 3 Cir. 7/24/96), 677 So.2d 1132. Factual findings of the workers' compensation judge may not be disturbed unless they are manifestly erroneous or clearly wrong. Banks v. Industrial Roofing & Sheet Metal Works Inc., 96-2840 (La.7/1/97), 696 So.2d 551.
At trial, Boutte testified as follows about her capabilities:
Q: [By Mr. Stevens] And you heard Mr. Johnson say that he has positions available for you and has had positions available for you where you did not have to sit for eight hours or for four hours; you could get up and move around and go apply ice?
A: Did youdo you
Q: Is that right Ms. Boutte?
A: Yes, I heard that.
Q: And do you think you could do that?
A: I would do it if he he could put with me going to that job and when I don't feelwhen I'm inin pain and cannot go andand stamp something or do something forfor five hours, and he going to pay me for eight eight hours, I'll go. If he'll pay me, I'll go *1319 there for five eight hours and cannot do something for five out of those eight hours and he going to pay me for eight hours, I'm ready to go.
In light of Boutte's testimony that she could return to work in some capacity for Langston, we find no error in the workers' compensation judge's denial of temporary total disability benefits. Even the claimant who can perform only sedentary work is not entitled to temporary total disability benefits. See Sharpless v. Jo Ellen Smith Medical Center, 557 So.2d 287 (La.App. 4 Cir.), writ denied, 558 So.2d 606 (La.1990).

b. Supplemental Earnings Benefits.
In Banks, 96-2840, pp. 8-9, 696 So.2d at 566, the supreme court recently summarized the analysis in a supplemental earnings benefits claim:
An employee is entitled to receive supplemental earnings benefits (SEBs) if he sustains a work-related injury that results in his inability to earn ninety percent (90%) or more of his average pre-injury wage. LA.REV.STAT.ANN. § 23:1221(3)(a) (West Supp.1997). Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. Freeman [v. Poulan/Weed Eater], 93-1530 at p. 7 [La. 1/14/94], 630 So.2d [733] at 739. "Th[is] analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers' compensation is to be liberally construed in favor of coverage." Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1007 (La.1989).

Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the employee's claim for SEBs or establish the employee's earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. LA.REV.STAT. ANN. § 23:1221(3)(c)(i) (West Supp.1997); Daigle, 545 So.2d at 1009. Actual job placement is not required. Romero v. Grey Wolf Drilling Co., 594 So.2d 1008, 1014-15 (La.App. 3d Cir.1992). The amount of SEBs is based upon the difference between the claimant's pre-injury average monthly wage and the claimant's proven post-injury monthly earning capacity LA.REV.STAT.ANN. § 23:1221(3)(a) (West Supp.1997).
(Emphasis added.)
Boutte first contends the workers' compensation judge erred in finding that she failed to prove the inability to earn ninety percent of her pre-injury wages. She argues that the workers' compensation judge should not have considered the medical records of Dr. Shepherd because defendants did not introduce them into evidence, and she cites the many cervical abnormalities revealed in the diagnostic studies as objective evidence corroborating her continued complaints of pain.
At the close of trial, defense counsel offered the "certified medical records of Dr. Clifton Shepherd as `Defense Exhibit # 4.'" Defense counsel further stated, "Everything Shepherd sent me is right there." At that time, the workers' compensation judge acknowledged that those exhibits had been prefiled. However, in the appellate record, only Dr. Shepherd's final report appears as "Defense Exhibit #4." The remainder of Dr. Shepherd's reports are found with the other pleadings. In light of defense counsel's intent, stated on the record, to offer all of Dr. Shepherd's reports and the workers' compensation judge's acknowledgment that they had been prefiled, we find that the reports were properly admitted into evidence. We also note that a certification from Dr. Shepherd's office appears with the prefiled exhibits.
In his deposition, Dr. Heard testified that the stenosis, or narrowing of the spinal canal, predisposed Boutte to a more significant injury and a more prolonged recovery. He also testified that the underfilling of the nerve root sleeve is a common indication of a neurological deficit, although he admitted that the existing studies did not show any impingement. Clinically, however, Dr. Heard's examinations did not differ from Dr. Shepherd's. Neither physician observed any objective symptoms, such as spasm, atrophy, *1320 abnormal reflexes, or diminished range of motion, although Dr. Heard stated that such signs were, in general, only seen in cases involving either a large herniation or a substantially pinched nerve. Dr. Shepherd reviewed the myelogram and the post-myelogram CT scan, and he still concluded that Boutte was capable of performing her former job.
In addition to the medical evidence, the workers' compensation judge also heard the testimony of Johnson, the plant manager, regarding the physical requirements of Boutte's job. Johnson testified that the "strap attacher" position had been streamlined for an easier sew. The job involved no lifting because other employees brought the bundles of straps to the sewers, and it could be performed either sitting or standing. Johnson also testified regarding the accommodations available to workers on light duty: they do not have to meet a production quota, and they are free to leave their post as required by their condition.
Boutte argues that she cannot perform the job's bending requirements and, further, that the bending requirements were not reported to Dr. Shepherd when he approved the position. Johnson testified that the job involved bending only if performed standing or if the employee dropped a strap on the floor. If the employee sat while sewing, the work station could be modified to minimize bending by placing the straps to be sewed on a table approximately the same height as the employee's seat. Boutte testified that she had used such a table in the past.
As the supreme court explained in Stobart v. State, Through Dep't of Transp. & Dev., 617 So.2d 880, 882-3 (La.1993):
[T]his Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106,1112 (La.1990)).
This court has recognized that "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.

After reviewing the entirety of the record, we find no error in the workers' compensation judge's finding that Boutte failed to prove that she is unable to earn ninety percent of her pre-injury wages.
Boutte next argues that, because she is not working, defendants must still prove that a certain job within her physical limitations was either offered or available to her, notwithstanding her failure to prove her inability to earn ninety percent of her pre-injury wages. We disagree. This argument is apparently based upon language in Hebert v. Grey Wolf Drilling Co., 611 So.2d 674 (La. App. 3 Cir.1992) that has since been criticized. See Rapp v. City of New Orleans, 95-1638 (La.App. 4 Cir. 9/18/96), 681 So.2d 433, writ denied, 96-2925 (La.1/24/97), 686 So.2d 868. Accordingly, we need not discuss Boutte's arguments concerning defendants' lack of proof on this issue.

c. Medical expenses.
The workers' compensation judge did not rule on Boutte's claim for additional diagnostic testing by Dr. Domingue. In Danzey v. Evergreen Presbyterian Ministries, 95-167 (La.App. 3 Cir. 6/7/95), 657 So.2d 491, we held that the silence of a written judgment on an issue in dispute is to be construed as a rejection of the relief requested on that issue. Considering Dr. Shepherd's recommendation that all treatment and testing be terminated and Dr. Heard's inability to identify a neurological deficit, we find no error in the rejection of this claim.

Violation of La.R.S. 23:1127

(Assignment of Error No. 1)
In this assignment, Boutte contends the workers' compensation judge erred in rejecting her claim for damages and attorney *1321 fees for Travelers' alleged breach of the confidentiality provisions of La.R.S. 23:1127. That statute permits the employee, the employer, and the insurer to obtain medical records from health care providers who have treated the employee. However, the statute also "mandates sanctions if the employer or insurer breaches it's [sic] obligation to preserve the confidentiality of any records thus received." City of Jennings v. Dequeant, 96-943, p. 11 (La.App. 3 Cir. 11/5/97), 704 So.2d 264, 270. If the employer or insurer breaches the statute's confidentiality requirements, the employee may recover his actual damages up to $1,000.00, plus all reasonable attorney fees necessary to recover such damages.
Boutte contends that Travelers violated La.R.S. 23:1127 when it released her medical records to Elizabeth Hoover, a vocational rehabilitation counselor not employed by Travelers. At trial, Terry Ware, a Travelers' adjuster, testified that Hoover was hired in this case to prepare a job analysis and to transport Boutte's medical records, the job analysis, and a video depicting the job's physical requirements to Dr. Shepherd's office for his evaluation. Ware did not testify that Hoover actually reviewed the medical records.
In Breaux v. Hoffpauir, 95-393, p. 4 (La. App. 3 Cir. 11/8/95), 664 So.2d 726, 728, reversed on other grounds, 95-2933 (La.5/21/96), 674 So.2d 234, we denied a similar claim, finding that insurer committed only "technically a breach" of the statute when it released the claimant's medical records to a medical management nurse. We further found that the claimant failed to prove "actual damages." In Dequeant, 96-943, p. 12, 704 So.2d at 270, we relied on Breaux in holding that the release of medical records to a rehabilitation counselor was only a "technical breach," where the claimant had previously requested vocational rehabilitation services.
We find Breaux applicable in this case. Even if Hoover's possession of Boutte's records were improper, we find it only a "technical breach" that did not cause "actual damages." There is no evidence that Hoover consulted the records in preparing her job analysis, and Hoover did not testify at trial.
The workers' compensation judge did not err in rejecting this claim.

Penalties and Attorney Fees

(Assignment of Error No. 5)
In this assignment, Boutte argues that the workers' compensation judge should have awarded her statutory penalties and attorney fees under La.R.S. 23:1201(F) and La.R.S. 23:1201.2. In light of our opinion affirming the workers' compensation judge's findings on disability, we find no error in the denial of these claims.

Dismissal with Prejudice

(Assignment of Error No. 6)
In her final assignment, Boutte relies on Jones v. Murphco of Florida, 93-540 (La.App. 3 Cir. 2/16/94), 640 So.2d 335 to argue that the workers' compensation judge erred in dismissing her claim with prejudice. In Jones, this court found such an error, citing the OWCA's continuing jurisdiction over any future petition for modification filed by any party in interest under La.R.S. 23:1310.8. In Matthews v. Farley Industries, 95-1387, p. 6 (La.2/28/96), 668 So.2d 1144, 1146, decided two years after Jones, the supreme court held that the present version of La.R.S. 23:1310.8 requires a prior "award" of compensation for the OWCA to consider a petition for modification. Because Boutte was not awarded compensation by the OWCA or this court, we find no error in the dismissal with prejudice.

Decree
For the above reasons the judgment of the Office of Workers Compensation Administration is affirmed. Costs of this appeal are assessed to appellant, Emily Boutte.
AFFIRMED.